James RHEM et al., Plaintiffs,

v.

Benjamin J. MALCOLM, Commissioner of
Correction for the City of New York,
et al., Defendants.

No. 70 Civ. 3962.

United States District Court,
S. D. New York.

Feb. 20, 1975.

The Legal Aid Society, New York City, for plaintiffs; William E. Hellerstein, Joel Berger, Steven A. Herman, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for defendants Benjamin J. Malcolm, Arthur Rubin and Abraham D. Beame; Donald Tobias, Asst. Corp. Counsel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, for defendants Peter Preiser, Hugh Carey and Owen McGivern; David Berman, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

On November 8, 1974, the Court of Appeals filed its opinion affirming our order of July 11, 1974 which was based on findings of unconstitutional conditions at the Manhattan House of Detention (the Tombs). The case was remanded for consideration of the relief to be granted.

### I.

On November 15, 1974, the Commissioner of Correction advised this court that the City had decided not to remedy the unconstitutional conditions at the Tombs, but rather to close the institution and transfer its remaining 350–400 inmates to the House of Detention for Men at Rikers Island. The plaintiffs do not dispute the City's right to close the Tombs (its use actually discontinued on December 20, 1974). They claim, however, that except for matters inextricably related to the physical structure fo the Tombs (such as the effect of excessive noise, heat and lack of ventilation, issues the plaintiffs now abandon) they are entitled to the same relief at the Rikers Island House of Detention for Men (HDM), where they are now held, as they would have been had they remained in custody at the Tombs.

The City, on the other hand, takes the position that the decision of the Court of Appeals is limited in its effect to conditions at the Tombs, and that therefore this court has no power to grant relief to the plaintiffs now housed at HDM. This is an oversimplification of the case.

In the opinion on which the order appealed from was based, we not only made findings of fact as to conditions at the Tombs, but determined the constitutional standards of protection to which detainees were entitled. These constitutional standards were specifically affirmed by the Court of Appeals which stated:

"The demands of equal protection of the laws and of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and the security of the jail; and the same constitutional provisions prevent unjustifiable confinement of detainees under worse conditions than convicted prisoners." 507 F.2d 333 referring to 371 F.Supp. at 623.

These remain the standards by which the validity of plaintiffs' claims—which now refer to conditions at HDM—are to be judged.

Moreover, the Court of Appeals affirmed our findings that:

1. A system of classification could be feasibly established which would identify the distinct minority of detainees who needed to be held in maximum security.

2. After the establishment of a classification system the needs of institutional security could be met without locking the large majority of detainees in their cells 16 hours a day.

3. The large majority of detainees who need not be held in maximum security are entitled to "contact visits" rather than being required to communicate with their visitors by telephone in glass windowed booths.

4. Visiting rights generally are unnecessarily limited and are far less than those accorded convicted felons.

5. A 50-minute per week opportunity for exercise is inadequate. 507 F.2d 333 and 339.[1]

The plaintiffs continue to press for relief as to the establishment of a classification system, limitation of lock-in, optional lock-out, adequate physical recreation, contact visits and other visiting conditions, disciplinary procedures and regulation of correspondence. In the earlier stages of this litigation (371 F.Supp. 594) the plaintiffs had prevailed on every one of these subjects. None of them is a matter inextricably related to the physical conditions at the Tombs.

To determine the facts at HDM relating to the items on which plaintiffs continue to ask relief, the court visited HDM (and associated Rikers Island facilities) in the company of counsel, the Commissioner of Correction, the Warden of HDM and several members of the plaintiff class,[2] and heard the testimony of witnesses on January 10th, 13th and 30th.[3]

■ The City argues that plaintiffs' claims for relief at HDM can only be pressed in a new lawsuit replete with full discovery and a trial de novo. For a number of reasons we emphatically disagree. First, the subject of the pending litigation is, as it has always been through its tortuous history, the rights to which plaintiff detainees are entitled under the Constitution. Second, the hearings held January 10th, 13th and 30th as to conditions at HDM, supplemented by visits to HDM and the testimony in the prior record of experts on the remaining issues of classification, lock-in, visitation, etc., constitute the equivalent of a plenary trial. Third, no showing has been made—or offered —which demonstrates the need for further discovery. Indeed the facts as to conditions at HDM are obviously fully known to the City defendants who are the very administrators of HDM. Finally, the Court of Appeals has specifically instructed in its opinion, that although the parties should have a further opportunity promptly to offer suggestions as to a final order here, ". . . the district judge should not allow another trial on the merits of plaintiffs' claim or countenance any significant delay in fashioning another decree. Four years after ugly riots caused by conditions at the Tombs, the time has come to end this litigation". While it is true that the Court of Appeals may not have contemplated that the City would close the Tombs, its instructions are applicable with equal force to the situation as it stands. To paraphrase Katz v. United States, "[The Constitution] protects people not places". 389 U.S. at 351, 88 S.Ct. 507 (1967).

---

1. The court concluded: "In short, after a review of the record and the applicable law, there is no doubt at all in our mind that [the trial judge's] findings of fact and conclusions of law in his detailed opinion in January 1974 [371 F.Supp. 594] must be affirmed."

2. The court had also visited HDM in August 1974 in connection with separate pending litigation.

3. The transcript of hearings is 431 pages in length.

■ Nor is there merit to the City's argument that plaintiffs' remaining claims have been mooted by their transfer to HDM. The claims as to conditions inextricably relating solely to the physical arrangement at the Tombs —such as excessive noise and heat, lack of ventilation, etc., have been abandoned. As to the remaining issues, plaintiffs contend that they continue to be held under unnecessarily restrictive conditions at HDM—just as they were at the Tombs—and the persistence of the issue undercuts the claim of mootness. The cases on which defendants rely are not to the contrary. They merely articulate the indisputable proposition that when a prisoner is transferred to a second prison at which the conditions of which he complained at the first no longer exist, his complaint is mooted.

We proceed to the merits.

## II.

*Classification:*

The Court of Appeals affirmed the finding at 371 F.Supp. 624–5 that the institution of a classification system at the Tombs was feasible and needed "to determine those who do and do not require maximum security custody." There is no evidence of record, nor any reason to believe that the institution of a classification system at HDM is any less feasible. The need for classification of detainees at HDM relates to the issues of lock-in and contact visits.

The City contends that there are only two reasons for the extended daytime lock-in hours at HDM, neither of which supports the need to establish a classification system: first, the necessity of head counts of detainees; second, the requirement of cleaning the jail. Plaintiffs do not dispute either that these functions are necessary or that they are not the sole reasons for daytime lock-in at HDM. They contend, however, that the number and duration of head counts is excessive and that the cleaning periods can be substantially shortened by using more detainees to do the job and by providing inexpensive additional cleaning equipment.

We discuss below whether the period of lock-in can be shortened by the devices plaintiffs suggest, but we agree with the City that, in any event, head counts and housecleaning are clearly required in the administration of HDM, and the question whether the periods devoted to them can be shortened, to permit a diminution of lock-in is unrelated to the classification of detainees.

■ The right to contact visits raises other considerations. The earlier decision in this case held that "a system of contact visiting be introduced . . . at least for all detainees who, by classification, are shown not to require maximum security custody." (371 F. Supp. at 626) The City has acquiesced in this requirement; but has not indicated whether it proposes to allow contact visits to *all* detainees. In the event that the City's plan does not provide all detainees the right to contact visits, the limitation of the right must be justified by a system of classification which will exclude only those inmates shown to require maximum security.

*Lock-in Time*

■■ Plaintiffs contend that lock-in time can, and should be, considerably lessened by reducing the number of head counts and shortening the periods of cleanup by use of more men and equipment. Seven head counts are taken daily at HDM. This is the same number taken at the Federal House of Detention in Manhattan,[4] and we find the number reasonable and necessary for the security of the institution. There is evidence that the duration of head counts and cleanup periods might be shortened, particularly in the case of cleanups. Yet it would be inappropriate for the

---

4. Testimony of Louis Gengler, Warden of the Federal Detention Center, in Valvano v. Malcolm, 70 Civ. 1390 (E.D.N.Y.1970) at p. 52A.

Gengler's testimony related to conditions as of January, 1974.

court to define a specific duration for either activity. What is clear is that the City has an obligation to complete these functions within reasonable periods of time, so that detainees—who are entitled to be held under the least restrictive conditions necessary for the institution's security—are not locked in their cells for periods longer than actually required, or as a pretext for the unjustified imposition of maximum security.

*Optional Lock-in:*

■ As its name suggests, the phrase "optional lock-in" refers to a system under which a detainee has the choice of remaining in his cell in lock-out periods. At 371 F.Supp. 628 it was held that while experiment might be necessary before final establishment of such a program, the City should provide a plan for optional lock-in "to assure, as the least restrictive alternative, that detainees are accorded, where possible, the 'right to be left alone'".

The City recognizes the value of optional lock-in and, to the credit of the HDM administrators, optional lock-in is permitted during the periods from the end of the evening meal, about 6:30 P.M., until 9:30 P.M., daily and 8:00 A.M. to 4:00 P.M. on Saturdays and Sundays.

The sole objection which the City posits to extending optional lock-in hours is that doing so will cause administrative difficulty. The City claims in particular that processing of visits will be significantly impeded if it becomes necessary for a correction officer to locate a detainee in his cell, should the detainee receive a visit during a period of optional lock-in. With due respect to the good judgment and sense of fairness with which the testimony of HDM's warden was imbued on other subjects, we find this argument unpersuasive and unsupported by the facts of record.

The dispute as to further optional lock-in relates solely to the hours during which "activities" occur; that is, the times when men on a particular cell block have the choice of attending various activities including library use, commissary visits, physical recreation, etc. At the beginning of that period, a detainee who engages in an activity proceeds to its location; those who do not are locked *out* of their cells, and must remain within the cell block on the floor or tiers outside the cells or in the block's dayroom. Those who would prefer to remain in—or return to—their cells for reading, writing or simply to be alone, are not permitted to do so.

We find nothing in the record to establish that should a detainee receive a visitor during an activity period, it would impede the processing of visits to any greater degree for a correctional officer to find the inmate in his cell than if the man were to be located in the public parts of the cell block or at a designated activity. While it is the prerogative of the administrator to determine how an optional lock-in should be implemented, there seems to be no dispute that whatever problem there might be in locating detainees for visits can be obviated by the simple device of requiring an inmate choosing lock-in to indicate the choice at the commencement of the activity period. He will, of course, thereby waive his right to attend an activity for that period, or to remain in the public parts of the cell block. However, his whereabouts will be as effectively known to the responsible correction officer as if he were at an activity or in the public sections of the cell block. The judgment below, therefore, orders the establishment of further optional lock-in on the conditions specified.

*Access to Counsel Outside HDM, Telephones and Overnight Housing in New York County:*

■ Plaintiffs' proposed judgment contains provisions (1) granting them the right to continue to meet counsel and receive personal visits in New York County (HDM is at the eastern extreme of Bronx County, adjacent to but separated by water from Queens County); (2) requiring the City to provide free daily access to telephones and (3)

requiring the City to provide overnight housing in New York County for plaintiffs who are to consult their attorneys or appear in court the following day.

It is understandable that plaintiffs pray for this relief, since through no fault of their own they have been transferred to HDM from the Tombs, located in New York County, where they enjoyed the right to daily telephone use, where access to counsel and visitors was significantly easier, and where they will face trial. Yet the relief is plainly beyond the power of this court to grant if for no other reason than that the subject matter has never formed a part of this suit. To its credit, the City, which voluntarily initiated a telephone program at the Tombs, is making every effort to provide the same services at HDM, although its island location presents mechanical problems which unavoidably slow the completion of the program.[5]

*Contact Visits:*

The City offered no evidence that contact visits, ordered at the Tombs, are not feasible at HDM. Indeed, it now agrees to establish a program for contact visits.

*Visiting Schedule:*

 The earlier decision held (371 F.Supp. at 628) that plaintiffs were entitled to liberalization of visiting days and hours at the Tombs. Plaintiffs claim that HDM's visiting schedule, as was that of the Tombs, is inadequate. The validity of visiting schedules must be judged by balancing a detainee's right to a reasonable number of visits from his family and friends against the limitation of possibilities inherent in the location and accessibility (or inaccessibility) of the institution.

A substantial part of the testimony at the hearings relating to HDM dealt with these problems. Special difficulties in providing visits at HDM are caused by its location on Rikers Island, which is not only relatively inaccessible—a single causeway is the sole approach and only one bus line carries passengers to the Island—but which is also the location of the Women's House of Detention, Adolescent Detention Center, Adolescent Remand Shelter and the City Penitentiary for convicted prisoners. The total inmate population of Rikers Island is approximately 6,000, including the 1500 detainees at HDM.

To its credit, and recognizing its responsibility for having transferred the Tombs inmates to HDM, the City has noticeably improved the visiting schedule at HDM from what it was at the outset of the renewal of this litigation. The present schedule allows the following visits:

| | |
|---|---|
| Monday | Children's Visits 4:00 P.M. to 6:00 P.M. (Adults May *not* visit on Monday unless accompanying the child of an inmate) |
| Tuesday | 10:00 A.M. to 1:00 P.M. |
| Wednesday | 10:00 A.M. to 1:00 P.M. |
| Thursday | 10:00 A.M. to 1:00 P.M. |
| Saturday | 11:00 A.M. to 2:00 P.M.* |
| Sunday | 11:00 A.M. to 2:00 P.M.* |

* Inmates are allowed visits on Saturday one week and Sunday the next week on an alternating basis.

Plaintiffs argue they are entitled to a still more liberalized schedule, both because even the old schedule at the Tombs allowed visits in greater number and length, and because the very remoteness of the institution—requiring visitors to spend most of the day coming to and going from Rikers Island, and thereby limiting the possible number of visits— justifies, if it does not compel, the grant of a visit of two hours duration.

5. The Special Committee on Penal and Correctional Reform for the New York County Lawyers' Association wrote to Mayor Beame on December 6, 1974 to inform him of the Committee's unanimous belief that the Tombs be used for men on trial and, if possible, for prisoners whose actual presence is required in court. The Community Service Society of New York wrote to the Mayor on December 13, 1974 to voice the same request.

As appealing as these arguments are, they do not carry the day. It is clear from the record that to expand the visiting schedule would, because of limitations of time and facilities at Rikers Island, result either in lessening the time or number of visits which inmates of other Rikers Island institutions enjoy, or of reducing the number of inmates at HDM itself who could receive visits at any given time.

It must be remembered that we are here dealing with constitutional rights which set minimal, not maximum or "desirable" standards. The constitutional norm ought to be a reasonable number of opportunities for visits of reasonable duration.

We cannot say that, in the circumstances, however desirable it may be that visits should be more frequent or longer, the present 30 minute period is *constitutionally inadequate,* so long as it provides, as it now does, at least a weekly opportunity for the inmate to receive a visit from his wife or some family member. Because so many of the wives of inmates either work during the day or are occupied as mothers at night, or both, the visiting schedule ought to assure a detainee of a weekly visit from his wife. The schedule has now been amended to assure that right by providing that every detainee is entitled to one visit either at night on Monday through Friday or during the day on Saturday or Sunday each week. Plaintiffs are entitled to the guarantee of that right.

In the earlier decision, it was held (371 F.Supp. at 625) that without reasons being shown to the contrary, plaintiffs, then inmates at the Tombs, were entitled under the equal protection clause, to a visiting schedule no less liberal than the schedule for convicted prisoners in State institutions. Moreover, the actual visiting schedule at the Tombs at the time plaintiffs were transferred to HDM was at least in some ways more extensive than HDM's present schedule. Plaintiffs contend that their visitation rights at HDM should be at least as generous as those which they enjoyed at the Tombs and which State prisoners are granted. The argument would prevail if conditions at HDM did not differ as markedly as they do both from State institutions and the Tombs. We have said enough above about the problems caused by HDM's inaccessibility and the necessity to process visitors at adjacent institutions to indicate why the State and former Tombs schedules are not, as the State schedule was in the earlier stages of the litigation, standards which can be automatically followed at HDM.

*Recreation:*

The earlier decision (371 F. Supp. at 627) found that the 50 minute per week opportunity for exercise at the Tombs did not meet constitutional standards. At HDM, for a number of reasons including the fact that the gymnasium is shared with inmates of the Adolescent Detention Center, the exercise period from October through May is also 50 minutes per week, and accordingly does not meet constitutional standards.

Both indoor and outdoor exercise facilities exist at HDM. Their enlargement is, of course, the only solution to the problem. The City has embarked on expansion of indoor facilities by commencing the construction of a separate gym to be used by adolescents. When this project is completed it will aproximately double the gym time available to HDM inmates. However, the target date for completion of the new facilities is 1977, and experience has shown that City construction projects are susceptible to even greater delay than is normally to be expected for private buildings. Accordingly, the new gym can be of no value to the present detainees who, even in extreme cases, will no longer be inmates at HDM when it is completed.

The outdoor facilities consist of five recreation yards in the areas between the cell blocks. These are used daily between late May and mid-October, but not otherwise. Plaintiffs urge that they

be allowed to exercise in these yards during the rest of the year (October-May). Clearly they are entitled to such use of these yards to bring their opportunity for physical exercise up to constitutional standards. We have set forth in detail (at 371 F.Supp. at 611–12 and 626–7) the testimony of experts at the original trial in this case that detainees ought to be afforded a minimum of one hour of exercise daily. Their opinions, and our findings, apply with equal force whether the jail in question is the Tombs or HDM.

The City's sole objection to the winter use of recreation yards is that it will require the employment of further manpower at additional cost. No one, least of all a public official, can fail to recognize the seriousness of imposing additional financial burdens on the City at a time when it is critically short of funds. Nevertheless, as we stated at 371 F.Supp. 626, quoting Justice (then Judge) Blackmun, "constitutional requirements are not, . . . to be measured or limited by dollar considerations . . ." Jackson v. Bishop, 404 F. 2d 571, 580 (8th Cir. 1968). This is especially true when the expenditure involved is a limited one as to cost.[6] Accordingly, the judgment will provide for the weekday use of the recreation yards during the winter period (October-May). This expansion of the recreational program will bring it within the ambit of constitutional standards. We do not require the use of the recreation yards on Saturdays and Sundays since the correctional manpower on hand at HDM and at the Central Security Facilities of Rikers Island on those days is seriously depleted. The benefit to the plaintiffs of the marginally additional exercise which the use of the recreation yards on those two days would afford is outweighed by the major expenditure which would be imposed on the City, an expenditure which would be unwarranted even in light of the rule set forth in Jackson v. Bishop, *supra*.

We are concurrently herewith filing a judgment embodying the decisions articulated in this memorandum.

6. At the hearings of January 30th, Warden Thomas of HDM testified that the institution would require four additional correctional officers each day for at least six hours to administer winter use of the recreational yards. Assuming that such men would be appointed to full time positions and that their salaries would average $13,500. per year (see Schedule annexed to Memorandum of Commissioner of Correction, November 27, 1974, to Director, Bureau of the Budget, attached to papers in support of plaintiffs' motion for an order providing that the inmate staff ratio at HDM be preserved, returnable January 15, 1975) the increased cost would be $54,000. plus fringe benefits.