**James RHEM et al., Plaintiffs,**

**v.**

**Benjamin J. MALCOLM, Commissioner of Correction for the City of New York, et al., Defendants.**

**No. 70 Civ. 3962.**

United States District Court,
S. D. New York.

April 23, 1975.

On Motion to Reopen June 26, 1975.

The Legal Aid Society, New York City, for plaintiffs; William E. Hellerstein, Joel Berger, Steven A. Herman, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for defendants Benjamin J. Malcolm, Arthur Rubin and Abraham D. Beame; Donald Tobias, Asst. Corp. Counsel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants Peter Preiser, Hugh Carey and Owen McGivern; David Berman, New York City, of counsel.

LASKER, District Judge.

Plaintiffs and the City defendants move under Rule 59(e) of the Federal Rules of Civil Procedure to alter our judgment of February 20, 1975.[1]

## I. Plaintiffs' requests for relief.

### A. Number of Visitors.

■ Plaintiffs propose that the judgment be amended by providing that members of the plaintiff class be permitted to receive at least three visitors per visit. In support of their proposal they refer us to our opinion after trial, 371

---

1. Plaintiffs' motion is also noticed under Rule 60(a) which relates to clerical mistakes. Nothing was contained in their papers pointing out any clerical mistakes and we know of none. Consequently we know of no relief that can be granted under that rule. Defendants' motion is also noticed under Rule 62(b) covering stay of execution of the judgment pending a Rule 59 motion. Such a stay has been granted and no further stay from the relief of our judgment of February 20, 1975 is granted or to be implied from the terms of this memorandum except as explicitly set forth in this memorandum or the judgment of February 20th.

F.Supp. 594, 606, in which we found that members of the plaintiff class, then housed at the Tombs, had at one time been allowed three visitors, that New York State prisoners were accorded three visitors at a time and occasionally four, and that the "one visitor" rule then in effect at the Tombs was "unnecessarily restrictive." It is argued that our opinion at 371 F.Supp. at 607, "called for 'more acceptable standards of . . . number of visitors.' " The argument is not sound for several reasons. While we did find after trial that there had been a period before trial when members of the plaintiff class housed at the Tombs had been allowed three visitors at a time, and that State prisoners were then permitted three or four visitors, our ruling that detainees at the Tombs ought then to be allowed more than one visitor at a time was based primarily on our finding that conditions as they stood at the Tombs were "unnecessarily restrictive". The use of the word "unnecessarily" was deliberate. It represented a determination that the visiting facilities at the Tombs were sufficiently spacious to permit more than one visitor at a time to meet with an inmate. This being so, to deny such a privilege would have breached the rule that a pretrial detainee is entitled to the rights of other citizens except to the extent necessary to assure his appearance at trial and the security of the institution. However, while the trial record established that more than one visitor at a time could be accommodated at the Tombs, there is no evidence of record as to the capacity of visitng facilities at Rikers Island.

Nor does the record contain any evidence upon which we would be justified in making a finding that, without reference to the physical conditions at a particular institution, a detainee has a constitutional right to receive a minimum number of visitors at a time.

It should be added that the statement in plaintiffs' brief that our opinion at 371 F.Supp. 607 "called for 'more acceptable standards' " etc., is misleading. The precise quotation is "We are presuaded that given adequate manpower, the Department could and willingly would meet more acceptable standards of visiting hours and days and number of visitors." This passage must be read in light of our holding not that plaintiffs had established a constitutional right to receive a minimum number of visitors, but a constitutional right to enjoy full reasonable use of the detention facilities.

### B. *Visiting Schedules*

Plaintiffs propose that we amend our judgment by specifying a) that visiting facilities- be open from 9:00 A.M. to 9:00 P.M. seven days a week; b) that every visit last a minimum of two hours and c) that detainees be permitted to receive visits daily. Our memorandum of February 20, 1975, accompanying the judgment of that date, stated (at page 14) that the constitutional norm as to the visiting rights of a detainee "ought to be a reasonable number of opportunities for visits of reasonable duration" and we pointed out that "it must be remembered that we are here dealing with constitutional rights which set minimal, not maximum or 'desirable' standards." Applying these criteria, we find nothing in the material submitted by plaintiffs on this motion which would justify amendment of the schedule in the judgment of February 20th. We fully recognize the desirability of an expanded visiting schedule, longer visiting periods per inmate and a greater number of visits and visitors per inmate, but there is no evidence of record before us to establish a constitutional right to minimums at the levels proposed by plaintiffs' memorandum. We are conscious of the phrases used in such trail blazing cases as Brenneman v. Madigan, D.C., 343 F. Supp. 128, 141 (N.D.Cal.1972) and Jones v. Wittenberg, D.C., 330 F.Supp. 707, 717, aff'd sub nom. Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972), but neither of these significant decisions grappled with the question of the precise number and length of visits or numbers of visitors to which a detainee is constitution-

ally entitled, and none of them sets a specific precedent for the schedule proposed by the plaintiffs.

### C. Recreation

■ 1. *Number of recreational periods.* The February 20th judgment ordered the City to "take all steps necessary to employ such additional correctional personnel as was necessary to afford every detainee a period of one hour outdoor exercise Mondays through Fridays inclusive, except in inclement weather." Plaintiffs ask that the City be required to provide exercise periods seven days a week. Two arguments are made in support of this request. They first point to the standards of such important agencies as the United Nations and the American Correctional Association as well as the testimony of Dr. Karl Menninger at trial which all specify a requirement that prisoners enjoy daily exercise. While we respect these standards and views highly, as our favorable references to them at 371 F. Supp. 611 and 626–7 attest, nevertheless they do not automatically establish constitutional norms, nor have we held that they do.

Second, plaintiffs express concern that our memorandum of February 20th "denied weekend recreation periods by balancing defendants' financial resources against plaintiffs' need for said exercise." This is a misconstruction of our memorandum of February 20th. In ordering an increase in recreational opportunities from one 50 minute period per week to five 50 minute periods per week, we explicitly recognized the additional financial expenditure imposed on the City but cited Justice (then Judge) Blackmun in Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968) to the effect that "constitutional requirements are not, . . . to be measured or limited by dollar considerations . . ." We went on to state that the expansion to five periods per week will "bring [the recreational program] within the ambit of constitutional standards." Our reference to the balancing of benefits to the

plaintiffs against even greater financial burdens to the City related only to the consideration of expanding the recreational period beyond the constitutional standard which we had already found was met by a five period per week program. We did not and we do not believe it sound doctrine that constitutional rights can be limited by money considerations.

■ 2. *Implementation Deadline.* Plaintiffs request that we set a deadline for the implementation of the expansion of recreational facilities. The question may now be moot in view of the fact that even by past practice the outdoor recreational facilities have been put into use in late May, and that, in any event, our judgment of February 20th ordered the defendants to take the necessary action to provide additional recreation "forthwith." However, in light of the history of the case, which has involved endless delay of implementation by the City, an amended judgment will provide that such action is to be completed no later than June 1, 1975.

### II. Defendants' Requests for Relief.

#### A. Right to Leave Cells.

■ The February 20th judgment provided that within 60 days defendants should permit plaintiffs to leave their cells at all times except for such reasonable periods as may be necessary for defendants to count the population and to clean the institution.

Defendants request clarification from the court as to whether this provision of the judgment was intended to prevent lock-in for three other purposes:

1. Post-breakfast lock-in to provide services for inmates scheduled to appear in court;

2. Lock-in of one side of the cell block while the other side of the cell block is eating; and

3. Night time lock-in.

It was not our intention that the judgment of February 20th should prevent these periods of lock-in. The theory

upon which all the holdings in this case, both by the District Court and the Court of Appeals, are based, is that a detainee has the right to be held in custody by the least restrictive method necessary for security or administration of the institution. The three periods in question meet that test. It is clearly necessary to make arrangements for inmates scheduled to appear in court. Secondly, given the particular structure of the cell blocks at HDM, it is justifiable that inmates on one side be locked in while their fellow inmates on the other side are eating. This is so because each cell block contains only one eating facility (located on Side B). Permitting inmates housed on both sides to move at large on the B side during the feeding period would lead to unmanageable crowding of the mess hall or unauthorized attempts by inmates to secure a second ration. Thirdly, the justifiability of lock-in during night time is to be measured by the reasonableness of the period involved and the reasonableness of the time at which it occurs. We cannot say that an eight hour sleeping or quiet period commencing at 9:30 in the evening is unreasonable in either respect.

■ While the judgment will therefore be amended to clarify these points, we reiterate the observation made at page 8 of the February 20th memorandum that inmates may not be " . . . locked in their cells for periods longer than actually required or as a pretext for the unjustified imposition of maximum security."

B. Defendants request that we eliminate subparagraph 2(b) of the judgment. We decline to do so except to the extent of eliminating the requirement that the defendants apply to the court for permission to impose a more restrictive lock-in schedule upon selected detainees in instances where the defendants can establish, based upon the classification system to be inaugurated, that implementation of the provisions of paragraph 2 as to these detainees jeopardizes institutional security.

C. *Optional Lock-in.*

■ We are asked to eliminate the provisions of Paragraph 3 affording the right of optional lock-in. We decline to do so. Nothing contained in the material presented by the defendants on this motion contains new evidence or establishes that the court has overlooked any of the evidence or arguments heretofore made on the subject.

Defendants also contend that the provisions of the judgment requiring optional lock-in to be inaugurated on an experimental basis would create problems by granting optional lock-in benefits to those in the cell blocks where the experiment was being conducted and not to others. The provision for inaugurating the program on an experimental basis was made on the basis of earlier testimony that such a change would require administrative planning. Since we are dealing with constitutional rights which cannot be denied, the sole alternative to ordering an optional lock-in plan on an experimental basis is to permit the administration to inaugurate the plan throughout the institution at the same time. The judgment will be amended to grant such an option.

D. *Visitation.*

1. *Number of visits per week.* The defendants request that we eliminate the provisions of Paragraph 5(b) ordering the defendants not to reduce the present number of visits per week. They claim the restraint thus imposed will prevent them from experimenting with more liberalized visiting schedules. To accommodate the desirable objective of experimenting with an improved visiting schedule with the requirement of adequate visiting time, Paragraph 5(b) of the judgment will be amended to read: "The present number of visiting hours per week shall not be reduced."

■ 2. *Contact Visits.* Four years after the commencement of this litigation, more than a year after the post-trial opinion requiring the City to provide a plan for contact visiting, and

months after the Court of Appeals' affirmance of that decision, defendants suggest that we eliminate our requirement that a contact visiting program be implemented in 90 days. At this late date, they continue to suggest that they be permitted to submit a program for contact visiting and that they be permitted to continue the use of the present glass walled visiting booths "in conjunction with the contact visit facilities to be constructed." We emphatically decline to grant the relief requested. We have been advised in open court on numberless occasions by the City's counsel that the City "had a plan" for contact visits, that the City "would present a plan" for contact visits or that the City was "in the process of preparing a plan" for contact visits. Yet to this day the City has not submitted the most tentative of suggestions as to the implementation of this key issue. We have at all times throughout this litigation indicated our willingness to allow the City a reasonable period of time to make the changeover to contact visiting. The 90 day allowance provided in our judgment of February 20th, the effect of which has been stayed to this moment, when added to the period since January of 1974, during which the City has been on notice and when considered in the light of the Court of Appeals' observation, 507 F.2d 333, 339, that:

> "If the handwriting was not yet clearly on the wall, it was at least more than barely legible to an interested reader. The City's claim that overall it did not have enough time to submit its plan is not persuasive."

adds up to a sorry history which cannot conceivably be prolonged.

 3. Defendants also ask us to eliminate the provisions of Paragraph 4(b). We decline to do so except to the extent of eliminating the requirement that the defendants apply to the court for permission to deny contact visits to selected detainees in instances where the defendants can establish, based upon the classification system to be inaugurated, that granting contact visits to those detainees jeopardizes institutional security.

### E. *Discipline.*

 Our judgment of March 22, 1974, enjoined the City from denying visitation rights to a prisoner who was either in administrative or punitive segregation. The ruling was based on a finding that the practice violated the equal protection clause because State prisoners in segregation were allowed normal visiting rights and there was no rational justification for different treatment of City and State prisoners. Based on a convoluted argument that we have misconstrued the State regulations in question, in particular 7 NYCRR § 301, and that the State in fact does limit visitation rights of segregated prisoners, the City asks us to eliminate the incorporation of a similar provision in our judgment of February 20, 1975. We disagree with the analysis of the State regulations set forth in defendants' memorandum. Moreover, the determination of the issue depends not only on the construction of the regulations but on their implementation in actual practice. Because neither party presented evidence on this point the court, with consent of counsel, requested the Commissioner of the Department of Correctional Services of the State of New York to inform it of the State practice. On March 6, 1975, William C. Donnino, Deputy Commissioner and Counsel to the Department, advised the court in relevant part as follows:

> "In brief, no inmate in a segregation unit can be denied a visit solely on the grounds of his presence in a segregation unit; nor may he be denied a visit for the purpose of punishment or discipline. 7 NYCRR § 301.6 and 301.8.
>
> "Certain conditions precedent to the visit (for example, dress, appearance and submissiveness to a search) may be required; but generally the conditions precedent to the visit are substantially the same for an inmate in

a segregation unit or in general population. Depending upon the institution, the search of an inmate in a segregation unit prior to or after a visit may be more extensive than the search of an inmate in general population.

"The conditions under which the visit takes place are generally the same for an inmate in general population or a segregation unit."

Under the circumstances, we decline to delete the provisions of Paragraph 7 of our judgment of February 20, 1975, which incorporates Paragraph 5 of our judgment of March 22, 1974.

We are concurrently filing an amended judgment in accordance with this memorandum.

## AMENDED JUDGMENT

This action having been tried by this court, Honorable Morris E. Lasker presiding, and the court having made and filed findings of fact and conclusions of law dated January 7, 1974, and having filed an order July 11, 1974; and the Court of Appeals by decision dated November 8, 1974 having affirmed this court's findings of fact and conclusions of law as to the unconstitutionality of conditions at the Manhattan House of Detention for Men (the Tombs), and having remanded for further consideration of the remedy to be provided; and the City defendants having terminated the use of the Manhattan House of Detention for the custody of any members of the plaintiff class and having transferred to the House of Detention for Men at Rikers Island, members of the plaintiff class who were, up to the time of transfer, in custody at the Manhattan House of Detention; and

Plaintiffs having presented a proposed judgment intended to insure that inmates transferred from the Manhattan House of Detention for Men are afforded treatment at the House of Detention for Men on Rikers Island consistent with the findings set forth in the court's opinion of January 7, 1974; and

The court having visited the House of Detention for Men on Rikers Island in the company of the parties and counsel and having heard testimony and taken evidence on the 10th, 13th and 30th days of January, 1975, to determine the applicability of the court's prior rulings regarding the issues of contact visits, visiting schedules, inmate classification, lock-out time and optional lock-in, to the House of Detention for Men at Rikers Island, and having considered the evidence presented and upon all the pleadings had herein, it is hereby

Ordered, adjudged and decreed that defendants, their agents and employees and all persons acting in concert with them be and hereby are permanently enjoined from incarcerating any detainee who is a member of the plaintiff class and is currently housed at the House of Detention for Men at Rikers Island, except under the following conditions:

### 1. Classification

Within ninety days of the entry of this judgment, defendants shall establish a classification system for purposes of implementing paragraphs 2(b) and 4(b) below.

### 2. Right to Leave Cells

(a) Within sixty days of the entry of this judgment, defendants shall permit plaintiffs to leave their cells at all times except for such reasonable periods as may be necessary to conduct counts of the population, clean the institution, arrange for court appearances, provide meals to inmates and provide a quiet sleeping period of no longer than eight hours, starting no earlier than 9:30 P. M.

(b) Defendants, upon establishing the classification system referred to in Paragraph 1 of this judgment, may impose a more restrictive lock-in schedule upon selected detainees in instances where defendants can establish, based upon said classification system, that implementation of subparagraph (a) of this paragraph would jeopardize institutional security.

### 3. Optional Lock-in

(a) Within sixty days of the date of entry of this judgment, defendants shall commence a program of optional lock-in during activity periods in two cell blocks chosen by the Warden of the House of Detention for Men at Rikers Island. Inmates in such cell blocks choosing to remain locked in their cells during activity periods shall have the option to do so.

(b) In the event that upon the expiration of thirty days after the commencement of such expanded optional lock-in the Warden of the House of Detention for Men at Rikers Island determines that it is not practical or feasible to extend such optional lock-in to all the members of the plaintiff class, he shall report to the court in writing his reasons for such a conclusion, furnishing a copy of such report to the attorneys for the plaintiffs. Within ten days thereafter counsel for the plaintiffs shall respond in writing to the court furnishing a copy of their response to attorneys for the defendants. Thereafter, the court will determine whether the program of expanded optional lock-in shall be eliminated, further tested or applied to all members of the class within the institution.

(c) Unless the Warden of the House of Detention for Men at Rikers Island shall timely furnish the court with the report referred to in the previous paragraph, then upon the expiration of the sixtieth day after the commencement of such expanded optional lock-in, all members of the plaintiff class shall be entitled to and receive such expanded optional lock-in.

(d) At the option of the defendant, Commissioner of Corrections for the City of New York, may commence the expanded optional lock-out program specified in sub-paragraph (a) above simultaneously in all cell blocks of the House of Detention for Men. Whether the Commissioner exercises the option provided in this sub-paragraph (d) or not, the procedures specified in sub-paragraphs (b) and (c) above shall be followed.

### 4. Contact Visits

(a) Within ninety days of the entry of this judgment all personal visits accorded plaintiffs shall be contact visits.

(b) Defendants, upon establishing the classification system referred to in Paragraph 1 of this judgment, may deny contact visits to selected detainees in instances where defendants can establish, based upon said classification system, that contact visits would jeopardize institutional security.

### 5. Visiting Schedule for Personal Visits

(a) The visiting schedule for personal visits shall be arranged to assure each member of the plaintiff class a minimum of one weekly visit at night or on a Saturday or Sunday. Every visit shall last a minimum of one-half hour and shall not then be terminated unless the visiting facilities are filled to capacity and additional visitors are waiting, in which case those visits which have lasted the longest in excess of the minimum shall be terminated first.

(b) The present number of visiting hours per week shall not be reduced.

### 6. Recreation

Defendants shall forthwith and no later than June 1, 1975 take all steps necessary to employ such additional correctional personnel as is necessary to afford every detainee a period of one hour outdoor exercise, Mondays through Fridays inclusive, except in inclement weather. Defendants shall permit detainees to possess warm outer garments and shall provide warm outer garments to indigent detainees to facilitate outdoor recreation in cold weather.

### 7. Discipline

The provisions of Paragraphs 4 and 5 and Schedule A of this court's judgment of March 22, 1974 shall be observed by defendants in respect to all members of the plaintiff class except to the extent stayed by this court's order of July 31, 1974.

### 8. Correspondence

The provisions of Paragraphs 1–3 of this court's judgment of March 22, 1974 shall be observed by defendants in respect to all members of the plaintiff class.

### On Motion to Reopen

Plaintiffs' motion to reopen the hearings and the amended judgment of April 23, 1975 is denied. To grant the motion would convert this suit, originally brought to challenge conditions at the Tombs on behalf of persons then inmates at the Tombs, into a plenary suit as to conditions at the House of Detention for Men at Riker's Island (HDM).

Following a determination by the Commissioner of Corrections in November, 1974 to close the Tombs and transfer its remaining inmates to HDM, plaintiffs argued that they were entitled to the same relief at HDM that they would have received at the Tombs. We agreed and scheduled hearings to receive evidence as to conditions at HDM. At the outset of these hearings the City argued that plaintiffs' claims for relief at HDM could only be pressed in a new lawsuit replete with full discovery and a trial de novo. As stated in our memorandum of February 20, 1974, we then disagreed with the position of the City because, since this case affected only persons transferred from the Tombs to HDM, evidence presented at the hearings related solely to the differences in conditions between the two institutions. We pointed out that such differences were obviously fully known to the City defendants who were the very administrators of the institutions and that, therefore, the City's argument that discovery and a plenary trial was necessary was disingenuous.

However, the material which plaintiffs seek by their present motion to put before the court is of a different character. Plaintiffs do not now propose to present data relating to differences between HDM and the Tombs but rather to create an affirmative record that (1) cells can be rearranged at the HDM so as to afford detainees who do not require maximum security custody greater freedom to leave their cells; (2) present population counts and cleaning of the institution can be done in less time than contended by the City; (3) visitation schedules can be improved at HDM because they are allegedly more flexible at other institutions. They also contend that "assuming *arguendo* that defendants were really unable to provide less restrictive housing to the vast majority of plaintiffs within the current structure at HDM, that structure would have to be altered or other non-maximum security facilities developed." (See Reply Affidavit of Joel Berger in support of the motion.)

These important issues raise extensive questions of law and fact which should not be determined in a case which is before us on remand from the Court of Appeals and for which a final judgment has been filed. Moreover, because the issues plaintiffs raised by their present motion may relate to conditions at institutions other than HDM, they should be litigated in a plenary lawsuit which will afford the defendants the rights of discovery necessary to present their case properly.

Plaintiffs request that if the motion is denied it be without prejudice to this court's reconsideration of the issues in question in a plenary lawsuit on behalf of all detainees at HDM. As we have earlier stated, this case has been prosecuted only by a plaintiff class of persons who were inmates at the Manhattan House of Detention (Tombs) at the time the suit was instituted. No decision in this litigation has ever had the effect or been intended to have the effect of adjudicating the rights of any persons at the House of Detention for Men except members of the plaintiff class in the instant suit. Accordingly, our denial of the motion as a matter of law is without prejudice to the commencement of any litigation on behalf of those de-

tainees at HDM who are not members of the plaintiff class in the present case.

Finally, in deciding this motion, we are mindful of the instruction of the Court of Appeals that "The district judge should not allow another trial on the merits of plaintiffs' claim or countenance any significant delay in fashioning another decree. Four years after ugly riots caused by conditions at the Tombs, the time has come to end this litigation." *Rhem v. Malcolm*, 507 F.2d 333, 341 (2d Cir. 1974).[1]

For the reasons set forth above, plaintiffs' motion is denied.

It is so ordered.

---

1. The National Prison Project—American Civil Liberties Union has moved for permission to file a memorandum in support of plaintiffs' motion to reopen the hearings.

The motion is granted. The decision we have reached has been made after consideration of the material submitted by the Amicus.