**UNITED STATES of America ex rel. Louis WOLFISH et al., Relators,**

v.

**The Honorable Edward LEVI, Attorney General of the United States, et al., Respondents.**

**No. 75 Civ. 6000 MEF.**

United States District Court,
S. D. New York.

Jan. 28, 1976.

1244

William J. Gallagher, The Legal Aid
Society, Federal Defender Services Unit,
New York City, for relators; Michael A.
Young, Phylis Skloot Bamberger, New
York City, of counsel.

Thomas J. Cahill, U. S. Atty., S.D.
N.Y., New York City, for respondents;
Louis G. Corsi, Victor J. Zupa, New York
City, of counsel.

FRANKEL, District Judge.

On November 28, 1975, this habeas petition was brought as a class action by people detained at our Metropolitan Correctional Center ("MCC")—which was designed primarily for pretrial detainees, but also houses sentenced people (either serving their terms here or, more characteristically, awaiting shipment to a prison), witnesses in confinement, and some others—complaining of an array of the jail's conditions including alleged overcrowding, double-celling, dead-lock practices, inadequate religious services, inadequate exercise, and visiting arrangements said to be unjustifiably and unlawfully restrictive. Subject to possible modifications contemplated by Fed.R. Civ.P. 23(c)(1), and in accordance with that provision, the court determined by

order dated December 23, 1975,[1] that the suit may be maintained as a class action. Shortly before that, to promote effective presentation of the many questions presented, the court had appointed the Federal Defender Services Unit as counsel for petitioners.[2]

On January 16, 1976, by order to show cause, petitioners moved for a prelimi-nary injunction to bar implementation of respondents' announced plan to cut the visiting privileges effective the next day. At the outset of the case, the provisions for visits gave all inmates three visits per week, at the following hours:

Apparently, no precise limitations on the length of visits or the number of people per visit had ever been firmly estab-

| | |
|---|---|
| 2nd and 5th floor: | 8:30–11:30 a. m., seven days a week |
| | 4:30–7:30 p. m., weekdays |
| 9th floor: | 8:30–11:30 a. m., seven days a week |
| 3rd, 7th, and 11th floor: | 12:30–3:30 p. m., seven days a week |

lished. Each inmate could have a list of six persons, whether family or friends, who would be entitled to visit. On or about January 13, respondents posted notices announcing that visits would be reduced "to two visits a week, a maximum time of one hour each."[3] In addition, visiting hours were altered according to the following schedule:

Finally, under the new directive, "visits will be limited to immediate family plus two friends. Under no circumstances,

| | |
|---|---|
| 3rd, 7th, and 11th floor: | 5:30–8:00 p. m. Tuesday and Thursday |
| | 8:30 a. m.–3:00 p. m. Saturday |
| 2nd, 5th and 9th floor: | 5:30–8:00 p. m. Wednesday and Friday |
| | 8:30 a. m.–3:00 p. m. Sunday |

however, can there be more than 10 people on an approved list at any one time."[4]

Although notices seem to have been posted on January 13 of the changes to be effective four days later, the court knows, as does everyone affected, that communications to and from the MCC are scarcely instantaneous. Counsel for petitioners moved with all desirable speed in bringing their order to show cause by January 16. On the afternoon of that day, after meeting with counsel for both sides, the court barred the imminent restrictions by a temporary restraining order.

## I.

Respondent Warden informs us that the suddenly announced diminution in visiting times "has been in the process of formulation by the MCC staff prior to the commencement of this proceeding and for more than three months * * *."[5] Since the changes would have an impact upon MCC staff, the Warden also says, he followed "binding past practice" (not otherwise specified, but entirely plausible) and "submitted the proposed duty roster to the union president approximately two weeks in advance of its implementation for review

1. The court, by oral statement, certified this as a class action on December 19, 1975; a written order was signed on December 23.

2. After appointment of counsel, an amended petition was filed on January 12, 1976; the essential issues, however, remain the same.

3. MCC Policy Statement No. 7300.4B–01/17/76, at 2. A provision to expand or contract "occasionally," depending on space considerations, was included.

4. Id. at 5.

5. Affidavit of Larry Taylor, sworn January 19, 1976, ¶ 1.

by the union."[6]  The union gave its approval, and the effective date of January 17 was accordingly set.[7]

Nobody thought it appropriate or necessary to have advance consultations with petitioners, their counsel, or the court.  Although the already existing provisions for visits were under attack in this case, there was no arrangement of any kind to notify counsel or the court that more restrictive rules, unilaterally determined (so far as the parties here are concerned), would be promulgated.  Instead, as has been mentioned, the news came on notices posted four days before the restricting changes were to be in force.[8]  Apart from its other dubieties, this course of action was not softened by an excepting provision for visitors who might come from afar or who might otherwise fail to hear in time to alter visiting plans.  As to the substantive grounds for the changes, respondents state that the old schedule was but temporary, designed to be changed as circumstances changed, and that the large number of visitors led to the revised schedule.[9]  Specifically, we are told:

"During the first two months of operation, the inmate population and number of visitors were increasing. By the second week of September, the number of visitors had increased to approximately 1,500 persons per week and at certain times of the week (weekends and the beginning of the week) the number of visits would rise substantially, thereby straining the capacity of the visiting facilities and causing delays in processing the visitors."[10]

Further, respondents report:

"The number of visitors at the MCC has risen to approximately 2,000 to 2,500 per week, with up to 500 of those visitors visiting on Saturday and 700 visiting on Sunday."[11]

The altered regulations, respondents assert, were meant to meet the situation as thus described and were "intended to enable the inmates to foster and maintain close family ties and community contacts consistent with practical considerations of security, availability of staff and visiting space."[12]

In response to the asserted justifications for the changes, petitioners show, by the submission of 92 inmate affidavits (said to be representative only because of the short time available for obtaining them), that the proposed hours and rules are more burdensome and restrictive than those currently in effect in that: many inmates now receive three visits per week; many inmates have spouses or other visitors who must care for children or the elderly during the non-school early evening hours; many inmates receive visitors from substantial distances who would be inconvenienced in attempting to return home after an evening visit; many inmates have more than two unrelated friends who are presently visiting.

## II.

 ■  It is surely true, as respondents stress, that executive officials rather than judges are in charge of prisons and jails.  18 U.S.C. §§ 4001, 4042 (1970); *Pell v. Procunier,* 417 U.S. 817, 827, 94

---

6.  Id. ¶ 9.

7.  Id.

8.  After the court had expressed some surprise and displeasure over the apparently high-handed change during the pendency of this proceeding, Associate Warden J. R. Johnson made an affidavit saying that in formulating the change, "we attempted to take into account the views of the inmates and visitors by discussing the matter with inmates, visitors and with the Unit Managers * * *." Affidavit of J. R. Johnson, sworn January 23, 1976, ¶ 2. None of the people thus said to have been consulted is identified.  Apart from that, and

accepting the Associate Warden's report, the main concern is unaffected.  No one suggests there was any notice to, or consultation with, the active parties in the case, counsel, or the court.

9.  Affidavit of Larry Taylor, supra ¶ 2.

10.  Id. ¶ 3.

11.  Id. ¶ 5.

12.  Id. ¶ 8.  The suggestion that the inmates would or will be benefited by the changes is unsupported by any expression of concurrence from the inmates themselves.

S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Daughtery v. Harris,* 476 F.2d 292, 294 (10th Cir.), cert. denied, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973). It is also clear, however, from the course of recent decisions, that people in confinement possess an expanding array of basic human rights. See *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 397 (2d Cir. 1975) (noting the recent erosion of "the historical reluctance of federal courts to interfere with the administration of penal institutions"); *Inmates of the Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 684 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974). Central among these rights is the opportunity to communicate and visit with kin and with friends, *Brenneman v. Madigan,* 343 F.Supp. 128, 141 (N.D.Cal.1972), a reciprocal opportunity protected in law for those on the outside as well as those inside. *Procunier v. Martinez,* 416 U.S. 396, 406–14, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The presumption is that these basic rights should be unfettered; restrictions on such valued rights must be justified by the requirements of the prison environment. *Procunier v. Martinez, supra* at 412–13, 94 S.Ct. 1800; *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Rhem v. Malcolm,* 371 F.Supp. 594, 625 (S.D.N.Y.), aff'd, 507 F.2d 333 (2d Cir. 1974); Id., 389 F.Supp. 964, 970–71 (S.D.N.Y.), aff'd 527 F.2d 1041 (2d Cir. 1975); Id., 396 F.Supp. 1195, 1197 (S.D.N.Y.1975); *Moore v. Ciccone,* 459 F.2d 574, 576 (8th Cir. 1972); *Finney v. Ark. Board of Corrections,* 505 F.2d 194, 211 (8th Cir. 1974).[13]

▮▮ At least where those incarcerated are being held for trial, presumed to be innocent rather than adjudged to be guilty, restrictions on access by visitors must be justified by "compelling necessity * * *." *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 397–98 (2d Cir. 1975); see also *Rhem v. Malcolm,* 507 F.2d 333, 342 (2d Cir. 1974) (citing 4 Blackstone, Commentaries 300); *Inmates of the Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 684–85 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Brenneman v. Madigan,* 343 F.Supp. 128, 141 (N.D.Cal.1972). In any case, the ultimate burden of justifying visitation restrictions for any class of inmates is always on the prison officials. "[T]he doctrine of least necessary restraint requires, as a matter of due process, that jail visiting conditions be curbed only to the extent needed to assure institutional security and administrative manageability." *Rhem v. Malcolm,* 371 F.Supp. 594, 625 (S.D.N.Y.), aff'd, 507 F.2d 333 (2d Cir. 1974); see also *Mabra v. Schmidt,* 356 F.Supp. 620, 631 (W.D.Wis.1973); *Brenneman v. Madigan,* 343 F.Supp. 128, 141 and n. 8 (N.D.Cal.1972); cf. Bureau of Prisons Policy Statement No. 7300.4A–4/24/72. Judged by the governing principles, in the circumstances that now appear, respondents have yet to justify the visiting provisions assailed when this proceeding was instituted. They have failed *a fortiori* to justify the more restrictive rules against which a temporary order is now sought. For that and other reasons further particularized in the following paragraphs, the motion for a preliminary injunction will be granted.

(1) The supposed necessities for further restricting visits are best known to respondents. But the facts submitted to justify what they have done are thin and unpersuasive. It is said, in broad generalities, that visits have been increasing in numbers—as surely they would when increasing numbers of people reside in the MCC.[14] We are told that the num-

---

**13.** The Bureau of Prisons' own Policy Statement reaffirms that visiting rights are to be maximized unless the necessities of prison administration demand their restriction. Bureau of Prisons, Policy Statement No. 7300.4A–4/24/72.

**14.** The number of people being housed in the MCC is also under attack in this lawsuit. It seems to be conceded that the prison is now housing many more than originally planned.

ber has increased lately to some 2,000 to 3,000, of which there are 500 on Saturday and 700 on Sunday. Against that is the undenied assertion that the 10 visiting rooms are empty much of the time. That assertion has to be true, of course, since most hours are not visiting hours. There is no suggestion why the solution for crowded visiting rooms, insofar as they are crowded, would not be to spread visits over more hours rather than contract the hours.[15] There is not even a concrete description of how crowded any visiting room actually is even at peak visiting times. Other restrictions, such as that limiting to two the number of non-related friends who will be on a prisoner's visitation list—a dubious restriction at best[16]—are nowhere explained or justified.

The MCC is in a sense "our" facility. It adjoins, and is connected to, this court house. The judges have been invited, and have mostly taken advantage of the opportunity, to tour the facility and observe it in operation. Among its positively impressive attributes are extensive items of electronic and other equipment to promote security for detainees and visitors alike with minimal use of custodial personnel. It seems probable for all that appears thus far that expansion of visiting hours would be perfectly feasible without unacceptable stress upon staff.[17] At least this is a possibility the court

will presumably be called upon to explore in adjudicating the charge that visiting rights were unlawfully confined when the case began. For the moment, the diminution of those rights *pendente lite* is justified neither by "necessity" nor even by a plausible showing of great convenience.

(2) Government counsel questioned when the present motion was brought whether petitioners made an adequate showing of irreparable injury from the decrease of possible visits by family and friends. The cool detachment of this contention is not lessened when we note that the main respondent before us, Warden Taylor, and the Bureau in which he works have affirmed the vital importance of visits to the morale and effective survival of people in confinement. It might have been supposed that nonexperts, merely as human beings, would know this. In any event, petitioners have now established, in copious affidavits (92 in number), what government counsel demanded.[18] Moreover, since we deal with rights ultimately constitutional, it may be doubted that the demand was well conceived even as a matter of technical law. Cf. *Quaker Action Group v. Hickel,* 137 U.S.App.D.C. 176, 421 F.2d 1111, 1116 (D.C.Cir. 1969).

(3) Where the balance of injury seems to fall clearly on one side, and where the ultimate resolution of the is-

---

**15.** Expanded hours may require additional manpower, of course. Restrictions on hours based on such a fact, however, will be of minimal persuasive effect. See *Rhem v. Malcolm,* 527 F.2d 1041 (2d Cir. 1975); *Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir. 1968) (Blackmun, J.); *Benjamin v. Malcolm,* 75 Civ. 3073 (MEL), at 9–10 (S.D.N.Y. January 6, 1976); *Miller v. Carson,* 401 F.Supp. 835, 842–43 (M.D.Fla.1975); *Rhem v. Malcolm,* 371 F.Supp. 594, 625 (S.D.N.Y.), aff'd, 507 F.2d 333 (2d Cir. 1974).

**16.** See *Brenneman v. Madigan,* 343 F.Supp. 128, 141 (N.D.Cal.1972); *Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd, 456 F.2d 854 (6th Cir. 1972).

**17.** It should not be necessary to justify the federal court's special acquaintance in fact with this federal facility. As life and legal doctrine have lately unfolded, the federal

courts have been much occupied in deciding complaints about *state* jails and prisons. Such cases present particular concerns of some delicacy; the intrusion of federal judges upon state domains is at best an occasion for some pause and some regret in our system. Cf. *Rizzo v. Goode,* —— U.S. ——, —— —— ——, 96 S.Ct. 598, 607–08, 46 L.Ed.2d 561 (1976); *Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Main Road v. Aytch,* 522 F.2d 1080, 1085–86 (3rd Cir. 1975). While it does not follow that federal judges should interfere freely with the Federal Bureau of Prisons, our review of fundamental claims in that sphere is likely to be both more knowledgeable and more doctrinally comfortable.

**18.** See also *Rhem v. Malcolm,* 371 F.Supp. 594, 606–07 (S.D.N.Y.), aff'd, 507 F.2d 333 (2d Cir. 1974); Bureau of Prisons, Policy Statement No. 7300.4A–4/24/72.

sue on the merits calls for further detailed study, the test of "probable success" is deemed to be less critical than it may otherwise be. *San Filippo v. United Brotherhood of Carpenters & Joiners of America,* 525 F.2d 508, 511–12 (2d Cir. 1975); *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953); *Crimmins v. American Stock Exchange, Inc.,* 346 F.Supp. 1256, 1258–59 (S.D.N.Y.1972); *Roy Export Co. Establishment v. Trustees of Columbia University,* 344 F.Supp. 1350, 1352 (S.D.N.Y. 1972). The court is not prepared now to forecast with confidence that petitioners will prevail. The issue requires for its resolution that we consider the actual conditions at the MCC, see *Rhem v. Malcolm,* 396 F.Supp. 1195, 1197 (S.D.N.Y. 1975), precluding any sure prediction of the outcome. It seems enough in all the circumstances to conclude that petitioners' case is substantial, warranting deliberate and reasoned consideration of all the facts pertaining to the merits, and justifying for the time being the maintenance without deterioration of the visiting conditions said to be unlawful even as they are.[19] In the face of an unquestioned worsening of the status quo, a preliminary injunction

> "serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began."

*Hamilton Watch Co. v. Benrus Watch Co., supra,* 206 F.2d at 742; see also *Benson Hotel Corp. v. Woods,* 168 F.2d 694, 696 (8th Cir. 1948); *Capobianco v. First Nat. Bank of Palmerton,* 372 F.Supp. 416, 421 (M.D.Pa.1974). Moreover, it is not without weight that government officials, as has been mentioned, will bear

a burden of justification to show that the needs of the MCC require their restrictions on visitation rights. This is by no means a decisive factor. It merits inclusion, however, in the roster of thoughts to be reviewed in balancing the equities. Cf. *National Association of Letter Carriers v. Sombrotto,* 449 F.2d 915, 920–21 (2d Cir. 1971).

(4) The high-handedness of the change here in question is itself a consideration against respondents in a court of equity. Such unilateral alterations of the very subject matter in suit has been held on occasion to subject the party so acting to a court's equity powers "wholly irrespective of the merits as they may be ultimately decided." *Jones v. Securities Exchange Commission,* 298 U.S. 1, 17–18, 56 S.Ct. 654, 658, 80 L.Ed. 1015 (1936); *People of Saipan v. Dept. of Interior,* 502 F.2d 90, 100 (9th Cir. 1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); *Ramsburg v. American Investment Co. of Ill.,* 231 F.2d 333, 336–38 (7th Cir. 1956). The court accepts the protestations that this lapse by the Government below simple courtesy was accomplished without any sense that more might be desired or required. This factor remains nevertheless a weight in the balance favoring petitioners.

(5) Respondents have not moved or pressed with notable speed toward an adjudication of the merits of this case. They should do so. No doubt the pendency of such a lawsuit is an inconvenience for officials charged with running a complex and populous jail. The court will strive for maximum feasible cooperation in proceeding with all deliberate speed toward a final decision of the issues. In the meantime, changes for the worse in the already contested situation are not to be encouraged. They ought surely not to happen without reasonable

---

**19.** For examples of judicial control over abridged visiting rights, see *Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd, 456 F.2d 854 (6th Cir. 1972); *Inmates of the Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 691, 693 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); and compare *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D. N.Y.), aff'd, 507 F.2d 333 (2d Cir. 1974) with id., 389 F.Supp. 964 (S.D.N.Y.), aff'd 527 F.2d 1041 (2d Cir. 1975), and id., 396 F.Supp. 1195 (S.D.N.Y.1975).

advance notice and an opportunity for orderly consideration.

The motion for a preliminary injunction is granted. Visiting regulations not less liberal than those in force when this suit began will remain effective until further order of the court.

It is so ordered.