UNITED STATES of America ex rel. Louis R. WOLFISH et al., Relators,

v.

UNITED STATES of America et al., Respondents.

No. 75 Civ. 6000.

United States District Court,
S. D. New York.

Jan. 5, 1977.

William J. Gallagher, Legal Aid Society, Federal Defender Services Unit, New York City, for relators; Michael Young, Michael B. Muslin, Phylis Skloot Bamberger, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, New York City, for respondents; Louis G. Corsi, F. P. Schaffer, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

Originally brought by a prisoner, who was transferred long ago but whose name still begins the caption, this action assails a number of conditions in the Federal Metro-

politan Correctional Center ("MCC") adjoining this Courthouse. The Federal Defender Services Unit, assigned by the court to represent petitioner class,[1] has pursued an extensive course of discovery, motions for preliminary injunction,[2] and other preparations for a trial which should begin within the next couple of months. In the meantime, claiming some issues are now ready for decision in their favor, petitioners have moved for partial summary judgment. Respondents have made a cross-motion urging that they should have summary judgment now dismissing most of the claims pressed in relators' motion; as to other matters, respondents urge that there are issues of fact requiring a trial. The motions before the court are described and decided as follows; most of the discussion dealing with matters found ripe for decision today, but noting along the way issues postponed for trial.

### I.

Designed and billed as a kind of modern showplace among jail facilities when it opened on August 2, 1975, the MCC contains some dormitory accommodations, but was designed mainly to house prisoners in a total of 389 rooms. The overall structure is 12 stories tall. Each floor designed to house prisoners has one or two largely self-contained units of dormitory or room facilities. Within each unit composed of rooms, there are groups of two to six "clusters" (a cluster being a corridor flanked by two rows of rooms), each containing five to eight rooms. The clusters or corridors open onto two-story "multipurpose" or common rooms. The multipurpose areas typically contain chairs, couches, pay telephones, television sets, eating tables, work tables, mail

boxes, exercise apparatus, typewriters, laundry facilities, ping pong and pool tables, and water fountains.

Some of the housing units also have pantries equipped with microwave ovens, drink dispensers, refrigerators, coffee urns, and ice machines. In addition to a toilet and washbasin in each room, there is one shower for each cluster and, on certain floors, additional toilet facilities.

Each housing unit has a visiting room with tables, chairs, couches, and bathroom facilities, and an education area with blackboards and bulletin boards. There is a roof-top recreation area with basketball, volleyball, and handball courts, and gym equipment.

Though built primarily as a pretrial detention center, the MCC also houses state prisoners and others in protective custody, post-conviction sentenced inmates, and youthful offenders. These "non-pretrial" inmates may comprise, on a daily basis, between 40 and 60% of the population.[3]

A major point on which petitioners now seek summary judgment is their complaint against the housing of two people in rooms said to have been intended for single occupancy. Respondents say triable issues of fact preclude decision now on this problem. The court has reviewed the extensive papers and exhibits addressed to this subject. In addition, while there has been no formal trial, the court has adopted respondents' suggestion and visited the MCC, with counsel for both sides, for the particular purpose of considering the physical facts of double celling. The result is that there appear to be no genuine issues as to facts fairly to be deemed material. The court concludes that petitioners are correct.

---

1. An order dated December 2, 1975, certified that the suit could be maintained as a class action pursuant to Fed.R. Civ.P. 23(b)(1) and (2). See *United States ex rel. Wolfish v. Levi,* 406 F.Supp. 1243 (S.D.N.Y.1976).

2. The court, in preliminary injunctions, has forbidden the narrowing of visiting privileges and a sharp curtailment of access to telephones, both changes having been made or attempted during the pendency of the case.

3. Petitioners contest the manner in which respondents classify inmates as "pretrial" or "sentenced." The debate concerns those inmates who are serving state sentences but currently in MCC awaiting trial on federal charges. Petitioners would class these inmates as "pretrial," respondents as "sentenced." Respondents' version has been taken for present purposes.

It is not disputed that each of the 389 rooms was, in respondents' word, "designated" for occupancy by a single inmate when the MCC first opened. In late November, 1975, however, as the population consigned to the MCC grew at a rate evidently unanticipated at the opening so short a time before, it was decided that some rooms would be used to house two prisoners each. As of the time of this decision, 121 of the rooms have now been "designated" for two inmates.

There are two basic categories of these double-occupancy rooms. By far the larger group—some 100 in all—are rooms with total floor space of 75 to 77 square feet. Each of these contains a double bunkbed (with one or two drawers placed on the floor under the lower bunk), a three-drawer desk, one (or sometimes, two) chairs, a shelf for toilet articles (approximately 2′ × 4″), a wash basin, an uncovered toilet, an extension lamp, and a three-foot book shelf (missing from many of the rooms during the court's visit while wall repairs are being completed). There is no place to hang clothing. The narrow aisle running the length of these rooms provides some 30 to 35 square feet of floor space available to be walked on.

The second category of rooms now used for double occupancy is a group of 21 in a so called honor unit; these are considerably less cramped and somewhat less disagreeably equipped for purposes of double occupancy. These rooms were originally designed as part of the hospital unit.[4] Those which now house two inmates vary in size from a little less than 115 square feet to almost 123 square feet. Each contains two beds, both resting on the floor on adjoining walls to form a right angle; one fluorescent light over both beds, one incandescent light over a sink and open toilet, and two night stands. There is a shelf, approximately 2′ × 8″, placed on the wall about six feet off the floor. Under the shelf are two large plastic hooks suitable for hanging clothing.

The inmates in this unit, the "cadre," are sentenced prisoners assigned to serve their terms at the MCC. They are not locked in their rooms at night, many of them having night work assignments.

Respondents cling zealously to the locution that the rooms in the MCC were originally "designated"—not "designed"—for occupancy by a single person. In this formulation, "designated" is meant evidently to denote a kind of optional, discretionary, changeable classification. A room "designated" to hold one person, the thought seems to run, may as easily be "designated" at some other time to hold two. The thought, it must be said, is not pursued beyond two, though it might readily be if linguistics were our only or primary concern.

The decisive reality, however, not seriously open to debate, is that the rooms were *designed* and built to hold a single person, not more. The conclusion is compelled by an array of undisputed facts. To begin with, petitioners invoke the high authority of the architect who designed the MCC and who, in sworn testimony recorded in this court, has described a room like the ones he drew, housing one inmate, as a "very basic planning principle." Contrasting dormitories with rooms, he went on to say:

"Dormitories are a much more flexible kind of a thing, you see. That is the only real area in that particular facility. One of the reasons why there's been a tendency to go to single rooms is because it's a very clear and apparent violation of capacity when you try to put two people in a room. You can't put one and a third persons in a room. You can always up the population of a space, in which you put people in, and you can through more imaginative planning get better utilization of the space but there is an absoluteness of a room which is designed for one person, and to try to convert it into a two-person room, it's a clear violation of

4. There is a total of 30 such rooms, nine of which are in fact used as infirmary rooms housing one inmate each.

the capability of that space. There is no question there. There is more than enough, you know, objections to double-celling." [5]

It is not necessary by any means to rely solely on what the architect *said*; the plain visual evidence of what he did demonstrates that the rooms he designed were for one inmate, not two or more. There is no place for each of two people, assigned by others to this unwanted intimacy, to walk or eat or write a letter or be quiet or be outside another's toilet. There is one shelf for toiletries and one for other things, neither adequate for two people. In the larger group of 100 double-celled rooms there is no place to hang a garment. The double-decker bunks by which these rooms have been changed from singles are so constructed that air from a vent, cold during our winter visit, blows out onto the upper bed a foot or so above body level. Many of the prisoners have blocked the vents to cope with this architecturally unintended unpleasantness. And, as a result the rooms are musty and unpleasant smelling. The single beds originally designed for these rooms each had two drawers built under them, mounted on casters for reasonably convenient use. In the reconstruction to house two inmates, it was found necessary to dismantle these caster arrangements; now each "double" room has one of the old drawers lying loose under the lower bed or none at all for the two assigned occupants.

As the units of formerly single rooms are doubled in occupancy, the multipurpose area for each overall unit displays oppres-sive consequences. Designed for use by the allotted number of single room occupants, the multipurpose rooms become congested, noisy, unworkable for their intended uses. The recreational equipment, never excessive, is less sufficient. The eating tables are, obviously, less adequate. There is more pressure to eat in the cell, with its single chair, open toilet, and unselected companion.

■ Taking all the facts together, the court concludes that this case is controlled by the principles of *Detainees of Brooklyn House of Detention v. Malcolm,* 520 F.2d 392 (2d Cir. 1975), and a growing list of decisions condemning double celling as unconstitutional. See also *Benjamin v. Malcolm,* 75 Civ. 3073 (S.D.N.Y. May 10, 1976); *Ambrose v. Malcolm,* 414 F.Supp. 485, (S.D. N.Y.1976); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass. 1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Wayne County Jail Inmates v. Wayne County Bd. of Comm'rs,* Civ. Action No. 173217 (Cir. Ct. Wayne, Co., Mich. July 28, 1972, and May 25, 1971), aff'd and remanded 391 Mich. 359, 216 N.W.2d 910 (1974); *Commonwealth ex rel. Bryant v. Hendrick,* 444 Pa. 83, 280 A.2d 110 (1971). There are, of course, factual differences among the cases. The larger group of rooms involved here, the ones with 75 to 77 square feet, are substantially more spacious than those in *Detainees,* though smaller, it appears, than those in *Inmates of Suffolk County Jail v. Eisenstadt, supra* (88 square

---

5. The quoted testimony is from a record made in this court in *Ambrose v. Malcolm,* D.C., 414 F.Supp. 485 (1976), involving a state facility. Respondents assail petitioners' reliance upon the testimony, generating a fair flurry of learned debate about admissibility of testimony taken in unrelated judicial proceedings and not cross-examined by the parties here, privity of parties, certified copies, Rule 56, Fed.R.Civ.P., and similar specialties. The short of the matter is, however, that the quoted testimony of the architect, Mr. Paul Silver, is patently reliable and not genuinely questioned at all. Respondents, for all the affidavits on file, nowhere suggest any other or different or qualified account they might pit against Mr. Silver's. It pushes dubious technicalities too far to urge that the court must ignore such sworn, tested materials in its own files on a motion for summary judgment—an occasion when an affiant, never cross-examined, may establish a fact to which he swears in writing. Rule 56(c). Fed.R. Civ.P. The time is passed when facts effectively known to a court and not meaningfully contested must be treated as nonexistent. Cf. *Leary v. United States,* 395 U.S. 6, 42 n. 81, 43 n. 89, 50 n. 106, 51 nn. 107 and 111, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1968) [citations to record of pretrial hearing in *United States v. Adams,* 293 F.Supp. 776 (S.D.N.Y.1968), as evidence of facts material to *Leary*].

feet). The inmates in the MCC (except for the small cadre of sentenced prisoners who, perhaps oddly, have more freedom than those awaiting trial) are confined to their rooms for shorter periods, some 7½ hours or so daily plus periods of head counts, as against the 14 to 16 daily hours in *Detainees,* though the impact on multipurpose rooms in this case diminishes the difference.[6] The average length of incarceration at the MCC (varying by category of inmate) is between 23 and 65 days, while that in *Detainees* was 16 weeks. The MCC is a far more modern and better decorated building than that involved in *Detainees.* The cells in MCC have doors instead of bars, and the common areas are carpeted. All of the residential rooms (with the exception of four cells in the protective custody unit) have an exterior exposure with a window. The comparisons do not uniformly favor the MCC. The jail involved in *Detainees* featured "a gymnasium, a theater auditorium and an enclosed roof recreation area" in addition to "a large variety of activities and programs" (520 F.2d at 396), contrasting notably with the dreary emptiness of the days in the MCC. All in all, however, the federal facility looks better, at least to an outsider.

Emphasizing the relative superiority of the MCC, and warming to the point of comparisons with college dormitories and similar residences, the Warden of the MCC says: "The rooms can accomodate [*sic*] two prisoners comfortably." Moreover, he presents the expertise of a psychiatrist, Dr. Walter William Menninger, who cites a period of service with the Bureau of Prisons and says, after visiting the MCC and reading some of the papers:

"Based upon my personal observations of conditions at the MCC, my review of the materials described in paragraph 2 above, and my experience in the field of psychiatry, particularly psychiatry as it relates to detention and correctional settings, it is my opinion that "double-bunking" as practiced at the MCC should not have any significant detrimental effects on the physical or psychological health of the inmates at that institution. Some important factors which prompt me to reach this conclusion are (a) the architectural design and finish of the residential rooms and common areas which convey a non-penal atmosphere and a sense of openness; and (b) the limited period of confinement of any given inmate to the room itself, both in terms of time each day (locked in only for sleeping hours and two count periods), and length of stay (majority of pre-trial inmates are in the MCC 20 days or less). Although the area of some of the residential rooms used for double-bunking may not be ideal, I have not seen any evidence that the "double-celling" practice at the MCC has caused any untoward effects on individual inmates. It does not appear to be psychologically destructive or an unacceptable deprivation of privacy; and there is no evidence it has prompted any increase of deviant sexual or aggressive impulses or tendencies."

There is, as everyone knows, a good deal of contrary expert opinion about the physical and psychological effects of confining two prisoners in one room or cell. See, e.g., *Detainees, supra,* 520 F.2d at 396. With all respect to Dr. Menninger,[7] as well as his fellow professionals in disagreement with him,[8] the court finds this issue controlled

---

6. An inmate in the MCC is substantially confined to his unit—his room plus his share of the multipurpose room. There is no yard for recreation. There is a rooftop gymnasium of sorts, usable for eight to ten hours a week by each inmate. There is no indoor gymnasium or weight room, no reading room, central dining facility, auditorium, or chapel. Except for members of the cadre, inmates may only leave their modular units when escorted by an MCC officer.

7. Cf. the possibly distinguishable paragraphs in K. Menninger, *The Crime of Punishment,* at 38–40 (1966).

8. It scarcely requires a psychiatrist to say it, but our attention has been directed to the testimony of Dr. Augustus F. Kinzel, given before the revered Judge Judd, marking the "humiliation of being locked in with another person, who you * * * may or may not [want] * * * to be locked in with, having to defecate and urinate in his presence * * *." *Volvano v. McGrath,* 70 C. 1390, testimony of

finally by juridical and human criteria that quite transcend the psychiatric debate.

The grounds on which authoritative penological groups and agencies have universally condemned double celling are vividly present here. See *Detainees,* 520 F.2d at 396. The open toilet, at mealtimes and in the middle of the night, remains a stark centerpiece. The fundamental denials of decency, privacy, personal security, and, simply, civilized humanity are all in essence the same when two people are thrown into single prison cells like these. The qualities of threat, nausea, and degradation are visible and palpable for any observer. Given the evolving legal standards of minimum decency defined in cases cited above, the judgment of a lay judge must control the conflicting views of psychiatrists and psychologists, no matter how the opinions are added or multiplied. A court is not required, after all, to litigate over and over again general propositions about matters of human experience that are either self evident or readily demonstrable once for all. We do not take evidence repeatedly that members of the species, often enough to serve as universals, respond unhappily to foul odors, social stigma, humiliation, and denials of minimal privacy. So, here, he who walks slowly and observes can read the uncontradicted evidence of circumstances that the law has now come to denounce as less than the constitutional minimum for the confinement of fellow human beings.

This conclusion applies to both categories of single rooms involved in this case. The 21 larger rooms in the honor unit (reserved for convicts, not for presumptively innocent detainees) are, to be sure, less blatantly offensive. Nevertheless, each was plainly and unmodifiably designed for one inmate, not two. It remains possible, if extremely unlikely, that single prison rooms somewhere will display "sufficient size and * * sufficient accommodations to permit double celling without deprivation of a detainee's rights." *Detainees, supra,* at 398. As a

practical matter, prison authorities, before reaching any such condition, would presumably move (or return) to the use of dormitories, with their greater flexibility and separate toilet facilities. But it is not the court's business to travel very far on such conjectural paths. It is enough to hold, and this court does, that the rooms before us do not rise to the level of possible acceptability for double occupancy.

Respondents stress the thought that the MCC houses sentenced prisoners and inmates from other places brought here on writs as well as pretrial detainees. It is suggested that the conditions in this facility, if unacceptable for detainees presumed to be innocent, may do for those serving terms after conviction. The argument has an air of perverse unreality on the undisputed facts; the only double-bunked rooms at the MCC are being used now for pretrial detainees, and, in one unit, some cooperating witnesses held in protective custody, while the greater privacy and security of single occupancy are enjoyed by sentenced prisoners. Apart from that oddity, and assuming respondents might revise the anomaly, their suggestion is not acceptable. First, the MCC was designed, including its structure of mainly single rooms, for the primary use of pretrial detainees, and that remains its main function. To have an inferior minority of persons housed in ways found unconstitutional for the rest would be a thoroughly deplorable arrangement, fairly to be condemned as cruel and unusual for those affected. There is no indication of how the discrimination would or could be effected without working such an intolerable result. Moreover, it would be sad indeed to have a new and highly publicized federal facility, displayed to the world with supposedly laudable single-room arrangements for presumptively innocent detainees, promptly transformed, at least in part, into a penal slum for persons serving sentences. Having demonstrated in action their judgment that sentences ought not to be served in such conditions, respondents

January 23, 1974 (Tr. 24). Dr. Kinzel went on to describe the tendencies of such confinement to cause alienation, increased suspicion, with-

drawal, feelings of helplessness and despair, and forced or traumatic acts of homosexuality. Id. 26–31.

enter quicksand when they seek the court's hypothetical blessing for a possible change of mind and heart.

■ The federal character of the MCC leads to some further observations of a somewhat preliminary nature which may become more significant as the case proceeds toward a final disposition. Today's condemnation of double celling is amply sustained, in this court's view, by precedents cited above. Most of those precedents relate to *state* jails or prisons. Accidents of history have caused much of our recent federal jurisprudence governing prison conditions to grow out of cases involving state prisoners. While the pertinent authorities cover this case, it is perhaps permissible to note that the standards we have applied to the states under the Federal Constitution must surely be the barest minimum we can allow for our prisons. In dealing with the latter, our powers (and duties) of supervision may well require more than that minimum. Pressing this notion in concrete terms, petitioners have invoked the Administrative Procedure Act and the specific federal statute defining the obligations of the Bureau of Prisons to "provide suitable quarters" and care, not less than discipline, for federal prisoners, 18 U.S.C. § 4042. These may well loom larger as the case progresses. And it may not be wholly irrelevant that the MCC, connected by a third-floor passageway to this building, is a place to which we federal judges consign people who are unable to meet bail conditions that we set.

These thoughts, whether or not they ever become decisive, are to be kept in view as the case progresses. For the moment, the grounds already stated are sufficient to condemn the practice of double celling at the MCC.[9]

## II.

■ The petitioners assail a Bureau of Prisons rule, applicable at the MCC, which forbids their receipt of books and other written material from anyone on the outside except publishers and book clubs. The rule raises obvious questions of moment under the First Amendment and, in distinguishing between affluent and other inmates, under the due process clause of the Fifth. Recognizing that these are substantial problems, respondents justify the rule as a permissible security device. The attempted justifications are inadequate; the rule must be nullified.

It is said that hard cover books may be used to secrete narcotics and other kinds of contraband. Such concerns—described as "obvious problems of security and administrative responsibility"[10]—comprise the entirety of the supposed grounds for the rule. With no record of untoward experience at places like the MCC, and with no history of resort to less restrictive measures, respondents' invocation of security cannot avail with respect to the high constitutional interests here at stake. It is evident that the enormous amount of literature published in paper or soft covers does not present the danger respondents cite. Yet their rule makes no pertinent discriminations whatsoever. It is also obvious that the variety of persons confined in the MCC—frequently people who appear to have had no connection with narcotics at all—are a population for whom more selective measures would avail.

Respondents' description of the relatively large MCC library is no ground for validating a restriction against people who may want to read all manner of things not present in that library.

There is a very considerable array of authority outlawing rules like the one now in

---

**9.** In a related but separate contention, petitioners seek a prohibition against the occasional placement of mattresses or beds in common areas not designed as sleeping quarters. The extent of such assertedly "emergency" arrangements is not clear. The court is not prepared to rule now on whether they have ever

been, or should ever be, justified. The situation may also be affected for the future by the elimination of double celling. The problem is left for resolution after trial.

**10.** Memorandum in Opposition to Motion for Partial Summary Judgment 49.

question. This court follows that body of precedent. *Cruz v. Hauck,* 515 F.2d 322, 333 (5th Cir. 1975); *Cruz v. Hauck,* 475 F.2d 475, 477 (5th Cir. 1973); *Manicone v. Cleary,* 74 Civ. 575 (E.D.N.Y., June 30, 1975); *Detainees of Queens House of Detention v. Malcolm,* 73 Civ. 1364 (E.D.N.Y., June 29, 1975) (summary judgment without opinion); *Funches v. Malcolm,* 73 Civ. 572 (E.D.N.Y., July 12, 1974); *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.1974); *Collins v. Schoonfield,* 344 F.Supp. 257, 281 (D.Md. 1972); *Inmates of Milwaukee County Jail v. Peterson,* 353 F.Supp. 1157, 1168–1169 (E.D. Wis.1973); *Marion County Jail Inmates v. Broderick,* 74 Civ. 434 (S.D.Ind., April 12, 1976) (no "books, magazines, or newspapers from any source"); *Cooper v. Morin,* Index 1411, 174 (Sup. Ct., Monroe Cy., N.Y., March 21, 1975); *Inmates of Allen County Jail v. Bender,* Civ. No. 71 F 32 (N.D.Ind., May 19, 1975) (consent decree); *Lambert v. Skidmore,* Case No. C 2 74–135 (S.D.Ohio, June 16, 1975) (consent decree). See also, *Seale v. Manson,* 326 F.Supp. 1375, 1381–82 (D.Conn.1971) ("Absolutely no reading material * * * accepted from outside personal parties." Approved magazines from publisher allowed.).

One recent decision, *Woods v. Daggett,* 541 F.2d 237 (10th Cir. 1976), is invoked by respondents for their contrary view. That case involved the Leavenworth Penitentiary. In upholding the "publishers only" rule, the court emphasized and re-emphasized that it was dealing with a "maximum security institution containing many dangerous inmates" where there had been a history of "bizarre efforts to carry contraband," including "cards which were found to contain hacksaw blades and drugs concealed within * * * thick paper * * *." *Id.* at 240. The quoted observations would appear to make the cited case distinguishable. It may be noted, however, that contemporary devices for detecting concealed things like hacksaw blades may still make it unnecessary to have so sweeping a ban on materials protected by the First Amendment. In any event, this court concludes that *Woods v. Daggett,* which is, of course, not controlling in this Circuit, requires no result different from that being reached today.[11]

### III.

The rooms in the MCC are searched from time to time for varieties of contraband. The petition raises some broad questions about the search procedures and the destruction of alleged contraband seized from the rooms. In their motion for summary judgment, petitioners seek two rulings at this time:

(1) That they should be permitted to observe while their rooms are being searched.

(2) That they should be given receipts for things taken.

The second demand, though vigorously resisted, will be granted now. The first, along with other, broader contentions, must await a fuller factual record for its resolution.[12]

Against the demand for receipts respondents initially made a swift and slightly chilling argument. They said:

"Since confiscated contraband is destroyed, except for cash, which is paid into the United States Treasury, * * *

---

11. A somewhat similar problem, but lacking in First Amendment concerns, is a rather sweeping prohibition against receipt of foodstuffs and other items. The asserted grounds for this restriction are not impressive. Nevertheless, there is enough in the professed fears of contraband and infection to stay the court's hand until the subject has been explored at trial. Still more sensitive issues are raised concerning allegedly inadequate library facilities and access to printed news media. Again, however, the court concludes that the nature of the injury, the extent of the deprivation, and the relative burdens petitioners would impose upon

the Government are topics requiring a fuller airing than the motion papers provide.

12. For the right to observe searches petitioners cite Judge Lasker, surely a leading authority in this field, in *Giampetruzzi v. Malcolm,* 406 F.Supp. 836, 844–45 (S.D.N.Y.1975). The cited decision, however, went explicitly on the record of evidence in the case. Respondents here raise arguments of security, search tactics, and administrative necessities requiring a fuller record than we have. On the other hand, respondents' application for summary judgment in their favor is insufficient.

it is difficult to see what purpose a receipt would serve, except as a record for disciplinary proceedings. * * * However, that purpose is satisfied by the completion of an incident report in those cases where the contraband is of a sufficiently serious nature to warrant disciplinary proceedings." [13]

When the court called for more enlightenment, respondents expanded on their search and confiscation practices by pointing to regulations which declare, *inter alia,* that:

(1) "Contraband" includes such specified items as narcotics, "[c]urrency, where prohibited," liquor, etc.

(2) "Many other items may be contraband" under a sweeping definition covering anything "not issued by the institution, purchased in the commissary, purchased through approved channels or approved for issue by an appropriate staff member", plus still other things "when found in excessive quantities, or altered from original status."

(3) The searching officer decides what is contraband to be seized.

(4) "Nuisance" contraband may be returned in the discretion of a "Unit Team Member (Unit Manager or Caseworker) or the Chief Correctional Supervisor * * *."

(5) Things not returned are destroyed, except for currency, which goes to the United States Treasury.

The foregoing account, incomplete but sufficient for the time being, is based on Bureau of Prisons regulations embodied in Policy Statements upon which respondents rely as authority for their procedures. Respondents argue that the authority to issue

such regulations is clear enough, and there is no quarrel with that general proposition. But regulations, certainly no less than statutes, are subject to the requirements of due process. The vice in the Government's position is that the procedures in question are as extreme in denying due process as they could possibly be.

Whatever minimal property a jail inmate may possess, and however minimal the rights attending that property may be, nobody doubts today that the prisoner is to be protected against seizures without some rudiments of primitive fairness. It is not necessary, though it seemingly will be before this case ends, to forecast the list of such fundamentals—notice, an opportunity to protest, "some kind of hearing," etc.[14] It is enough for now, ruling only on what is properly here, that respondents must be ordered to give receipts for what is taken in searches of the rooms.[15] It is depressing to hear in this time the solemn contention that minor correctional officers may seize property in unobserved searches, take it away, and then destroy it (or purport to destroy it) without even telling the possessor what they have taken, leaving no possibility of recourse or question concerning their self-regulated judgments (as to whether they actually took anything, as to whether things they took were contraband, what should be destroyed, what may be returned). Now that the contention has been made, for the first time in this court's knowledge, it merits prompt rejection.

### IV.

There are several issues concerning mail to and from petitioners. These are ripe for decision now.

---

13. Memorandum in Opposition to Motion for Partial Summary Judgment 62.

14. See Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267 (1975); cf. Verkuil, *A Study of Informal Adjudication Procedures,* 43 U.Chi. L.Rev. 739 (1976).

15. When respondents spelled out their views on the seizure and destruction of "contraband," petitioners, in a reply memorandum, found the position "shocking" and demanded in a phrase

"a proscription against such destruction or conversion." Reply Memorandum 25–26. But that is in turn too speedy and unconsidered. It is unlikely the court will proscribe totally the "destruction or conversion" of weapons, liquor, narcotics, and other things. The probable crux of the problem will be one of substantive scope and, more importantly, fair procedure. As we move toward and beyond trial, the parties should be formulating their positions in more specific and particularized terms.

■ (1) Petitioners complain against the requirement that their letters to the outside be placed unsealed in the mailbox for reading at will by correctional personnel. The asserted justifications for this requirement run a gamut from trivial to ludicrous.

It is said inmates may write about escape plans. The supposed concern is dissipated, however, when respondents acknowledge that petitioners are free to make uncensored telephone calls and to have personal visits without the overhearing of their conversations.

Inmates might seek to mail molds for keys, or money, or other contraband. The molds can be detected without reading the mail. Money and "other contraband" are risks at most *de minimis* when measured against the gross invasions of privacy entailed in the wholesale reading of the mail.

Finally, if it might better have been omitted, the argument is made that "spot-checking the letters to and from sentenced inmates can be extremely helpful in alerting the staff to problems facing * * * inmates or to other matters which may help in evaluating their progress * * *."[16] There is no suggestion of any respectable evidence for this thought. If there were, it would remain a callous claim to rights of intrusion of an intolerably offensive character, degrading in the extreme to those ostensibly viewed with concern. The notion of reading their mail for "evaluating their progress" is uniquely graceless, moreover, when it is tendered for a group consisting mainly of detainees awaiting trial.

Once more, respondents' position is overwhelmed by a considerable weight of authority. See e. g., *Hamilton v. Love,* 358 F.Supp. 338, 346 (E.D.Ark.1973); *Gates v. Collier,* 349 F.Supp. 881, 898 (N.D.Miss. 1972), *aff'd,* 501 F.2d 1291, 1310–1314 (5th Cir. 1974); *Obadele v. McAdory,* Civil Action No. 72J–103(N) (S.D.Miss.1973); *Kinale v. Dowe,* Civil Action # 73–374–GT (S.D. Cal., October 29, 1973); *Marion County Jail Inmates v. Broderick,* No. Id. 72–C–424 (S.D.Ind., April 2, 1976); *Lambert v. Skid-more,* Case No. C 2 74–135 (S.D.Ohio, June 16, 1975) (consent decree); *Inmates of Allen County Jail v. Bender,* Civil No. 71 F 32 ¶ 3 (N.D.Ind., May 1975) (consent decree); *Moore v. Janing,* Civil No. 72–0–223 ¶ 11 (D.Neb., March 8, 1973) (consent decree). The court will order that petitioners be freed to seal outgoing mail, subject only to (a) inspection by electronic or other devices to detect hidden objects, without opening the letters, and (b) the power to read contents, in the sender's presence, upon a showing of good cause.

■ (2) A different result is reached on petitioners' claim concerning mail from attorneys and courts. MCC rules allow "legal" mail to be opened to check for contraband, but not to be read, and only in the presence of the inmates. Petitioners are entitled to no more than this; there is no requirement of good cause for such inspection. *Wolff v. McDonnell,* 418 U.S. 539, 574–77, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The partial judgment now to be entered will favor respondents in this respect.

■ (3) Finally, there is the question of incoming mail from persons other than attorneys and legal officials. This is at least as subject to scrutiny as "legal" mail. It is clear, therefore, that this category of mail may be opened to screen out contraband. Moreover, the administrative burden of doing this in the inmates' presence would be severe beyond the demands of privacy petitioners understandably urge. At the same time, the paper submissions and the court's direct knowledge of the MCC make it plain that there can be no sound reason for allowing correctional personnel routinely to *read* incoming letters. The worry about mailed escape plans, given the physical situation and other means of communication, is a trivial rationalization. The offensive desire to search out personal problems has been sufficiently answered earlier. Nothing substantial supports the invasion by officials of the privacies in letters to people awaiting trial or sentenced to relatively short terms in the secure confines of the MCC.

**16.** Memorandum in Opposition to Motion for Partial Summary Judgment 63.

**344**

Balancing the several interests, the court will order that (a) non-legal mail addressed to petitioners at the MCC may be opened and searched for contraband, (b) without probable cause or the recipients' presence, but (c) with the firm understanding, to be enforced with rigor, that the contents are not to be read, except on a showing of good cause, and then only in the recipient inmate's presence. Petitioners question that the last of these directives is meaningful. How, they ask, can they trust the correctional people to refrain from reading the mail? It is naive to doubt that the question is legitimate. Nevertheless, the response must be the kind of naivetè required of judges; until or unless the contrary is shown, the presumption of official regularity must remain significant in the apparatus of Government. It is to be expected that those in charge of the MCC will make the most vigorous efforts to enforce the prohibition now ordered, and to impose due sanctions for its violation. If the court's presumptions and expectations prove unfounded, further measures may be necessary. In the meantime, as stated, the adjustment now ordered seems just and appropriate in light of the constitutional principles governing the problem.

### V.

To summarize: Upon the cross motions before the court, petitioners are entitled to a partial decree enjoining (a) double celling, (b) enforcement of the "publishers only" rule, (c) failure to give receipts for seized property, and (d) the practices respecting mail hereinabove found to be invalid. Respondents are entitled to dismissal of the claims as to mail which have been rejected. As to the first item, double celling, some limited but reasonable time should be allowed to complete compliance, though action toward that end should begin immediately. Cf. *Detainees, supra,* 520 F.2d at 394–95. The other rulings are capable of enforcement, and should be enforced, within the next week or 10 days.

Accordingly, petitioners should serve and file a proposed form of decree on or before January 10, 1977. Respondents should respond not later than January 13, indicating any specific objections they may have to petitioners' proposed decree and offering substitute language where there are such objections. Petitioners may reply on or before January 17, 1977, whereupon a decree will be formulated and entered.