602 F.Supp. 476 (1984)
Billy Joe TYLER, et al., Plaintiffs,
v.
UNITED STATES of America, Plaintiff-Intervenor,
v.
Gordon SCHWEITZER, et al., Defendants.
Cause No. 74-40-C(4).
United States District Court, E.D. Missouri, E.D.
August 31, 1984.
*477 Frank Susman, St. Louis, Mo., for plaintiffs.
Joseph Moore, Asst. U.S. Atty., St. Louis, Mo., for plaintiff-intervenor.
A. Robert Belscher, John J. Fitzgibbon, Robert H. Dierker, Jr., St. Louis, Mo., for defendants.
Curtis F. Thompson, Asst. Mo. Atty. Gen., Jefferson City, Mo., Gene Schultz, American Civil Liberties Union of Eastern Missouri, Joseph Downey, Public Defender, City of St. Louis, St. Louis, Mo., for movants.

MEMORANDUM
CAHILL, District Judge.
This matter is before the Court on plaintiffs' motion for contempt, defendants' motion to join additional parties, defendants' various motions to modify the Court's interim orders, and plaintiffs' motion for attorney fees and costs.
The plaintiffs are members of a class consisting of all persons who are now confined, have been confined, or will be confined in the Jail of the City of St. Louis awaiting trial because they have no money to make bail. The defendants are the Sheriff of the City of St. Louis, the City Commissioner of Adult Correctional Services, and the Warden of the City Jail. In 1974 the plaintiffs filed this successful action in which they sought and were granted relief from certain unconstitutional conditions of confinement at the City Jail. The Court imposed a limit of 228 prisoners at the facility. In 1982 the plaintiffs moved the Court to hold the defendants in contempt of court for violating this 228 prisoner limit.
Evidentiary hearings on plaintiffs' contempt motions commenced in September of 1982, pursuant to the Court's continuing jurisdiction over this action. Initially the Court determined that members of the plaintiff class were regularly and repeatedly being housed in other facilities, such as the Police Holdover and the Medium Security Institution known as the City Workhouse. Because these facilities were regularly and repeatedly being used to house members of the plaintiff class who but for lack of space would be housed at the City Jail, the Holdover and the Workhouse were, in fact, mere extensions of the City Jail. As extensions of the City Jail, these facilities are required to conform and adhere to the constitutionally required standards of population, sanitation, health services, and other housing standards mandated by the Court for the City Jail. See Rhem v. Malcolm, 389 F.Supp. 964, 966-68 (S.D.N.Y.1975) (pretrial detainees transferred to another facility were entitled to same constitutional standard at latter facility as court had previously found they were entitled to while incarcerated at the former *478 facility), modified, 396 F.Supp. 1195 (S.D. N.Y.), aff'd, 527 F.2d 1041 (2d Cir.1975).
The Court found from uncontradicted testimony that the conditions at the Police Holdover differed significantly from those at the City Jail and clearly did not meet even minimum constitutional requirements. The uncontroverted testimony showed a lack of the most basic sanitary facilities including ordinary bedding, change of clothing, and items such as toothbrushes and toilet paper. Prisoners had no opportunity to wash their hands or to shower, they slept on steel slabs, and were required to use their clothing as towels and for toilet paper.
The Police Holdover, having been found to subject the plaintiffs to clearly unconstitutional conditions, has now been permanently excluded as a detention site for pretrial detainees held for more than a maximum of three days, unless an exception in writing is made by this Court. All City Jail detainees against whom warrants have been issued by a judicial officer shall be held in the Police Holdover no longer than 24 hours after the issuance of such warrants. However, on holidays and weekends these prisoners are to be held in the Police Holdover no longer than the first day after the holiday or weekend. The responsible officers of the Police Department have also agreed not to detain military prisoners and extraditable fugitives for more than three days in the Holdover.

The City Workhouse.
The City Workhouse, pending receipt of further evidence, was limited to a self-imposed maximum population of 525 prisoners. To better assess the conditions at the City Jail and the City Workhouse, the Court appointed the National Institute of Corrections (NIC) as an expert in this matter. The NIC is affiliated with the United States Department of Justice and has been working with a variety of jurisdictions on jail overcrowding problems. The Court has reviewed the various reports from the NIC. Based on these reports and other evidence, the Court is now prepared to set population limits at the City Workhouse.
The Court concludes that at this time the proper population limit at the City Workhouse is 450 inmates. This conclusion is based upon inter alia, an investigative report filed by the Commissioner of Adult Correctional Services; two NIC reports dated August 1983 and August 1984; testimony of plaintiffs' expert Arnold Pontesso at a December 3, 1982, evidentiary hearing; a report by Pontesso dated November 22, 1982; testimony of City Workhouse Superintendent Willis Roberts on December 3, 1982; and information derived from an order adopting the recommendations of Magistrate David Noce in Andrew Harris-Bey v. Roberts, No. 81-766C(4), (E.D.Mo. June 8, 1982).
For the most part, the evidence shows that under ideal conditions, given the existing square footage, the Workhouse is capable of physically housing 525 inmates. In determining capacity, however, the amount of available square feet alone is insufficient. The amount of recreational facilities, supervisory staff, maintenance, space needed to properly implement a classification system, and the general conditions of confinement must also be considered. Several reports indicated the lack of maintenance at the Workhouse. Others stressed the need for sufficient space to properly implement a classification system. Plaintiffs' expert Pontesso stressed the need to remove inmate beds from the dayroom area. And of special note, the Commissioner's report stated that with the present staff 450 inmates were supervisable and adequately secure.
This limit of 450 prisoners is subject to change on a proper showing by the defendants that measures have been taken which enable them to adequately supervise and house more prisoners. Further, in the event of an emergency or mass arrest the defendants may exceed the current limit at the Workhouse for up to three days without prior court approval. The defendants must, however, make a subsequent full report to the Court on any such occurrence. *479 The defendants must receive the prior approval of this Court to exceed this limit for more than three days.

Plaintiffs' Motion for Contempt.
The evidence clearly shows that the defendants were in contempt of the Court's 228 inmate limit at the City Jail in September of 1982. The defendants, however, have now purged themselves of this contempt by their subsequent actions. The Court both notes and appreciates the spirit of cooperation exhibited by the defendants. Of particular note is the limited reduction in staff at the Workhouse while similar city agencies were undergoing reductions in force because of budgetary restrictions. Also, the Court notes the temporary hiring of area lawyers as assistant public defenders. These additional public defenders expeditiously disposed of a number of criminal cases, substantially reducing the backload of detainees being held awaiting trial. Of even greater value was the increase in budgeting by the State of Missouri for the regular staff of the Public Defender. That office handles over 90% of the confined defendants, and must be adequately staffed if the cases are to proceed to trial in a timely fashion.
The Court is proud of the fact that voluntary cooperation has obviated the need for greater judicial intrusion into this matter. The City of St. Louis has made a genuine effort to improve its correctional facilities both physically and programatically over the past 18 months. The Police Holdover is no longer being used to house City Jail detainees, the City Jail is within its prescribed limit, and the City Workhouse population has been averaging between roughly 360 to 400 prisoners for the last few months. With this average population the Workhouse should have no problem keeping within the Court's prescribed limit of 450 prisoners.
The City is cautioned that it cannot merely rest on its laurels. It has not yet clearly determined the cause of the reduced Workhouse population; the detention population may well increase in the future. The City is directed to continue its efforts to improve its pretrial detention procedures and facilities. It must be ever remembered that the detainees have not yet been convicted. Each is awaiting trial and would be released on bond if he or she had money. No one should be punished because of his poverty.
The primary problem at the City's detention facilities has been overcrowding caused by a large number of pretrial prisoners. This problem has no easy solution, but pretrial prisoners have a right to be housed constitutionally. See Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Burks v. Teasdale, 603 F.2d 59 (8th Cir.1979). The two basic methods for alleviating overcrowding are (1) provide additional housing for pretrial detainees, or (2) reduce the number of pretrial detainees. Cost estimates for building new facilities ranged from $30,000,000 to $70,000,000, and are continually rising. The City's fiscal position makes this alternative unfeasible until all other alternatives are explored. Even if these funds were available, it is more prudent to attempt to hasten the processing of criminal trials and expand the recognizance release program before imposing this financial burden on the beleaguered City. The establishment of effective pretrial release recommendation procedures has been repeatedly shown to lead to significant reductions in the pretrial detainee population without increasing the rates of rearrest or of nonappearance in court. See 4 D. Pryor & W. Smith, Pretrial Issues: Significant Research Findings Concerning Pretrial Release, No. 1 (February 1982).

Attorney Fees.
In light of the remedial actions taken by the defendants as a result of plaintiffs' motion for contempt, the plaintiff class is clearly a prevailing party and is entitled to attorney fees and costs. See 42 U.S.C. § 1988. The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times *480 a reasonable hourly rate. Blum v. Stenson, ___ U.S. ___, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891, 896 (1984). The fees sought by plaintiffs' counsel are as follows:

Attorney Hours Rate Total
Frank Susman 132.5 × $150 = $19,875.00
B. Stephen Miller III 70.8 × 90 = 6,372.00
Gene P. Schultz 19.3 × 75 = 1,447.50
Michael Waxenberg 19.0 × 75 = 1,425.00
Legal Assistants 6.0 × 55 = 330.00
 __________
 Total: $29,449.50

Plaintiffs' counsel seek to have this base figure enhanced by 33 1/3 percent. The Court concludes, after careful review, that the hours expended by plaintiffs' counsel are reasonable.
A reasonable hourly rate is usually the ordinary fee for similar work in the community. The term "reasonable hourly rate" has been defined as the hourly amount to which attorneys in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation. Jorstad v. IDS Realty Trust, 643 F.2d 1305 (8th Cir.1981). Using the Jorstad standard, the Court finds $75 to be a reasonable hourly rate of compensation for attorneys Miller, Schultz, and Waxenberg. Only Miller's hourly rate has been reduced. This is not a criticism of Mr. Miller; he has ably served in this matter. However, automatic acceptance of a lawyer's customary charge would be an abdication of the Court's duty to do justice to the losing as well as the winning side. "[I]t is particularly important that those rates which are applied be, in fact, reasonable hourly rates." Jorstad v. IDS Realty Trust, 643 F.2d at 1312. The Court feels that to grant Miller a higher hourly rate than Schultz or Waxenberg, who have either comparable or superior experience, would be unreasonable.
It is reasonable, however, to grant lead counsel Susman a higher hourly rate. Using the Jorstad standard, the Court finds $150 to be a reasonable hourly rate of compensation for attorney Susman. Reflected in the determination of Susman's reasonable fee are considerations of, inter alia, the skill requisite to perform the legal service properly, the preclusion of other employment due to the acceptance of the case, the experience, reputation, and ability of the attorney, the customary fee, and awards in other cases. While these factors were considered in assessing the other attorneys' fees, they support the award of a higher hourly rate when applied to Susman.
Plaintiffs' counsel seek an award of $55 as a reasonable hourly fee for work done by legal assistants. However, the Court finds that a rate of $35 per hour for legal assistants is reasonable.
As plaintiffs' counsel point out, this case was unpopular and undesirable. This undesirability is reflected in the Court's unsuccessful attempts at persuading attorneys to represent the plaintiff class. Invitations were extended to the local bar associations and other groups urging their participation. Few came forward to argue the clear constitutional rights of the accused. Frank Susman accepted this task, and the Court agrees that his fee should be enhanced therefor. Although he was assisted by other counsel, as lead counsel Susman must suffer the umbrage of pursuing an unpopular cause. Accordingly, because of the nature and difficulty of this case, the contingent nature of the fee, and the inherent delay in payment, Susman's fee shall be enhanced by 25 percent. The remainder of the fee award shall be enhanced by 10 percent, reflecting the contingent nature of the fee and the delay in payment due to the duration of this litigation. The resulting awards are as follows:

*481
 Attorney Hours Rate Enhancement Total
 Susman 132.5 × $150 = $19,875.00 25% $24,843.75
 Miller 70.8 × 75 = 5,310.00 10% 5,841.00
 Schultz 19.3 × 75 = 1,447.50 10% 1,592.25
 Waxenberg 19.0 × 75 = 1,425.00 10% 1,567.50
 Legal Assistants 6.0 × 35 = 210.00 10% 231.00
 __________ __________
 Total: $28,267.50 $34,075.50

Plaintiffs counsel seek to recover $1,734.83 as costs in this matter. These costs were necessary and are not excessive. Accordingly, this request for costs shall be granted. The Court notes that the payment of attorney fees and costs is, in effect, a sanction against the defendants which, by its nature, will discourage future violations.

Other Pending Motions.
The Court previously stayed consideration of the defendants' motion to join additional parties and various motions to modify the Court's interim orders. It is evident that the parties sought to be joined do have significant relationships to this matter. However, the problem has been currently resolved on the basis of voluntary cooperation by local officials, and the Court does not feel it necessary to join these parties at this time. Further, because of the commendable cooperation by local officials and by the State of Missouri, the Court also denies defendants' various motions to modify the Court's interim orders. No modifications are necessary in the light of the Court's present orders.
The Court will maintain continuous jurisdiction of this matter, and the parties are directed to file interim annual reports on the City's pretrial detention procedures and facilities starting January 31, 1985, and each year thereafter.