737 F.Supp. 531 (1990)
Billy Joe TYLER, et al., Plaintiffs,
v.
UNITED STATES of America, Plaintiff-Intervenor,
v.
James W. MURPHY, et al., Defendants.
No. 74-40-C (4).
United States District Court, E.D. Missouri, E.D.
April 11, 1990.
*532 Frank Susman, Susman, Schermer, Rimmel & Shifrin, St. Louis, Mo., for plaintiffs.
John J. Fitzgibbons, Stephen J. Kovac, Brian Witherspoon, Assoc. City Counselors, Joseph B. Moore, Asst. U.S. Atty., Joseph Downey, Public Defender, City of St. Louis, St. Louis, Mo., Gary L. Gardner, Asst. Mo. Atty. Gen., Jefferson City, Mo., for defendants.

INTERIM ORDER
CAHILL, District Judge.
The Court takes judicial notice of its own files in this case and makes reference particularly to the Court's Order dated August 31, 1984, 602 F.Supp. 476, which fixed the maximum population for inmates of the MSI (Workhouse) at 450 inmates. That number has remained constant for more than six years except for the fluctuations on weekends which had been contemplated.
Beginning in February, 1990, this Court has repeatedly given oral permission to exceed the 1984 ceiling in varying numbers and on a day-to-day basis; up to 31 additional inmates for the last several weeks were permitted.
The increase of 31 inmates had been initially permitted by the Court in order to give the superintendent of the MSI an opportunity to test the feasibility of placing 31 inmates on house arrest using "electronic shackling." When the circuit judges of the City of St. Louis failed to approve the program using the electronic shackles, this Court then broadened the authority of the jail officials to increase the number of detainees by the same number, whether restrained by the electronic devices or not. The population has remained at or very near the new maximum of 481 inmates since that time.
In order to clarify the Court's intent, the Court now modifies and amends its previous Order in the following specific manner:
1. The Court now amends its previous Order as to the ceiling for the inmate population of the MSI by permitting an increase from 450 to 481 inmates until August 1, 1990, provided the following conditions, limitations, and restrictions are fully complied with by the defendants.
(a) The number of guards and other essential staff is to be increased by 10% within 30 days of this Order. The Court further directs the defendants not to decrease the quantity or quality of the food provided inmates, nor to reduce clothing allowances or the availability *533 of medical and dental treatment.
(b) The Court Orders the defendants to submit a plan for the implementation of house arrests for detainees, including "electronic shackling," within 30 days of this Order. The plan should be submitted simultaneously to the Circuit Judges of the City of St. Louis for their comment, evaluation, rejection or approval. An essential element of the plan must include an analysis of the legal significance of the exposure of Jail staff to lawsuits for "third-party risk" claims caused by release of detainees who are accused but not convicted of crimes.
(c) The Court further Orders the defendants to submit within 30 days of this Order a plan for approval by this Court for the expeditious transfer of women inmates to another site. The cost and location of one or more facilities may be included.
(d) The Court further Orders the defendants to transfer all inmates found guilty and sentenced thereafter to the designated penal institution of the State of Missouri not more than 10 days after the imposition of sentence. All military prisoners, persons awaiting extradition, and persons charged with violation of probation or parole are to be transferred to Missouri or other state authorities within 10 days of their incarceration in the St. Louis jails.
(e) The defendants are further ordered to broaden and expand their educational facilities so as to include elementary school classes as well as "G.E.D." or high school equivalency training within the MSI and to report on the status and plan for increasing the educational program within 30 days. Inmates should be encouraged to attend.
(f) The Court further Orders the defendants to submit within 30 days of this Order a plan for the establishment of a drug treatment center located within the MSI. The drug treatment center must be free to detainees and attendance required of all detainees who have been accused of drug-related offenses. Other detainees who wish to attend may do so. The Court expects the plan to indicate the possible resources to be utilized, the use of volunteers as well as part-time professional staff, and estimates of the annual costs.
(g) The Court further Orders the defendants to file a status report with this Court every 90 days regarding conditions of health and safety in both the MSI and the City Jail. The Court expects and Orders the defendants to permit this Court to make personal inspections at both unannounced and prearranged times.
(h) The Court further Orders the defendants to give a daily count of the population at both the MSI and the Jail before 5:00 p.m. and to continue the delivery of the weekly computerized reports of REGIS.
The Court will consider comments, objections, or other pleadings that may be filed by any of the named litigants within 30 days of this Interim Order.
The Court now stays its ruling on all previously filed motions for 90 additional days in order to analyze and evaluate the status of conditions at the MSI and the Jail. On or before August 30, 1990, the Court will issue its order continuing, expanding, or otherwise amending this Order determining the population level of the MSI.
The limitations listed herein are conditions precedent to the increased population levels and further, all existing Orders not specifically waived or amended by the Court are to remain in full force and effect.
SO ORDERED.

MEMORANDUM
Once again, the problem of overpopulation of the jails of the City of St. Louis is before this Court. Harried jail officials have been struggling to contain an ever-expanding jail population within the unyielding walls of the local jail and workhouse for more than 20 years. The questions of how, when, and where to confine *534 the many, many persons awaiting trial in the Circuit Courts of St. Louis have yet to be answered, even though mayors, judges, and administrators have diligently sought solutions to the problem.
Because the decisions to be made in this case may have significant community impact, the Court has summarized in greater detail than usual the history of the problem and has made a sincere effort to put into perspective some of the alternative solutions and the effects of their implementation. While good judicial practice minimizes the use of personal opinion, there are exceptions to every rule. The problems of the jails of St. Louis are matters with which this Court has had familiarity for more than 20 years. During that period, this Judge has held the position of government administrator, prosecutor, defense attorney, Missouri circuit judge, and finally, has presided over this case as U.S. District Judge for nearly eight years. The knowledge attained in this service cannot be forgotten, nor should it be, in its entirety.
These various perspectives have enabled the Court to see the problem in its broader dimensions and not merely to view the problem as the simple legal issue of compliance with a court order. The Court has tried, by its example, to examine the problem as it affects the entire community, and has urged all litigants and other relevant entities (e.g., the police, prosecutors, the mayor, and other city officials) to follow that pattern. The Court has separated its personal observations from its legal conclusions by indicating in this memorandum only suggestions which are not binding upon the parties, in contrast to the attached Orders which are.

Introduction
In the City of St. Louis, three separate levels of the judiciary exercise the power to confine a person to a jail or prison. First, the federal courts enforce the penalties for violation of federal laws but incarcerate their prisoners only in federal institutions. Second, the Municipal Courts of St. Louis (generally referred to as the "police courts") decide cases involving the ordinances of the City of St. Louis, such as peace disturbance, driving an automobile under the influence of alcohol, or resisting arrest.[1]
By far the greatest number of detainees are those persons held for trial in the third level, which is the Circuit Court of the City of St. Louis. The judges of this, the Twenty-Second Judicial Circuit of Missouri, are all appointed by the Governor to be members of the judiciary of the State of Missouri. These are the judges before whom the state charges must be tried and they are the judges who have ordered the prisoners detained in the City Jail and Medium Security Institution (Workhouse) while awaiting trial. After conviction, the detainees would usually be assigned to state penitentiaries.
For the purposes of this memorandum, a prison is defined as a building where persons (prisoners) convicted of serious crimes are confined while serving their sentences. See MO.REV.STAT. §§ 71.300 (1986); 221.010, et seq. (1986). A jail is usually thought of as a place where persons serving short sentences are housed, or where accused persons (detainees) are kept confined while awaiting trial. See MO.REV. STAT. § 21.440, et seq. (1986). The Missouri statutes provide for a minimum imprisonment of two years or more in prisons operated by the State of Missouri. For imprisonment up to one year, the City of St. Louis (and other counties) usually provide a jail to hold those persons serving time for ordinance, misdemeanor, or minor felony violations. Such sentences are for a year or less. See MO.REV.STAT. § 556.011, et seq. (1986).

Historical Summary
For many years the City of St. Louis has operated two penal institutions, the City Jail located at 14th and Clark Streets adjacent to the Criminal Courts Building, and *535 the St. Medium Security Institution (MSI) located at 7600 Hall Street near the river and generally referred to as the "Workhouse."
The Workhouse is a misnomer today because the traditional function of providing a prison for short-term prisoners required to do hard manual labor has long since expired. Both the City Jail and the MSI are now utilized by the City to hold those persons charged with crimes and awaiting trial who have not been released on recognizance and who cannot afford bail. Some of these are being held for the most serious charges, such as assault, murder, and other serious crimes of violence; they would be unlikely to qualify for any kind of pretrial release. But the great majority of persons detained are charged with less violent offenses; particularly numerous are the drug-related charges.
Because the City Jail has individual cells which offer greater personal security to a prisoner, its quarters are used for the most aggressive or the most vulnerable prisoners. The Workhouse (MSI) has ward and/or barrack arrangements where the population mingles more freely. The City's classification system tries to assign individuals to the most appropriate of the two institutions.
In 1974, the Court declared those incarcerated in the City Jail as class plaintiffs and ordered stringent changes designed to eliminate many inhumane conditions that existed in the jail at that time. The population was reduced from 500 to 280 inmates, one-man cells were mandated, medical and social services were established, toilets made operative, the extermination of mice, vermin, and insects begun, and the guard personnel doubled. These and other remedial orders reduced much of the jails' savagery and violence. These orders helped to establish minimum levels of security, health, and sanitation there. But it was not until 1982 when this Judge inherited the case that these same basic safeguards were extended to the MSI (workhouse) because the authorities were routinely utilizing both the MSI and police holdover cells as extensions of the City Jail.
Even worse, cells in the Police Holdover were without even the minimal hygienic standards  no toilets or water, no blankets or pillows for the steel beds, and no opportunity for communication with lawyers, family, or friends. The Police Holdover had originally been designed to hold prisoners for just a few hours, yet it was used to confine many for several weeks! By Order of this Court, the use of the Police Holdover as a jail was eliminated.
After adversarial hearings, evidence was adduced which this Court relied upon to reduce the workhouse population from 485 prisoners to 450 prisoners; that number was made contingent upon certain staffing, health, and safety provisions delineated by this Court, but similar to the standards established in the City Jail. See Tyler, et al. v. United States, 602 F.Supp. 476 (E.D. Mo.1984).
The primary problem remaining, however, impinging on all aspects of the operation of the jails, is the overcrowded inmate population. From 1984 to the fall of 1989, there were spasmodic exceptions to the population ceiling in the City workhouse, and even in the City Jail. But these exceptions were infrequent and appear to have been occasioned by negligence or inadvertence of mid-level supervisors. Even so, these digressions have led to charges of contempt of court which are still pending.
In the fall of 1989, though, a more serious chain of violations began to occur because of the huge number of drug-related offenses. The number of prisoners exceeding the ceiling began to escalate and the days when overcrowding existed began to increase. Instead of an isolated overage, violations became a regular occurrence requiring extraordinary efforts on the part of jailors and judges in attempts to control the flow of prisoners from court to jail.

The Escalation of the "War on Drugs"
In mid-1989, the so-called war on drugs began to intensify. The U.S. Congress and many state legislatures, including Missouri, enacted many new laws related to drug offenses which were as Draconian in nature as they were politically popular. *536 Greatly enhanced punishments were decreed for even the most petty sale or for the possession of minute quantities of any contraband drug.
When more police officers were assigned to investigate drug-related offenses, naturally they made more arrests. The prosecutors thereafter filed more charges. The trial docket grew and delays became greater. Consequently, the jail population exploded. Each division of the criminal justice system is a link of a chain. A chain is no stronger than its weakest link. By increasing the productivity of one link in that chain without commensurate funding for the other links of the criminal justice system is to reap delay, failure, and continued mistrust of the courts and the criminal justice system.
Over a decade ago the State of Missouri adopted a policy of utilizing recognizance in lieu of bail for those persons too poor to pay for a bail bond. A recognizance accepts the promise of the accused to appear in court as directed and, depending upon the circumstances, to be accountable to a sponsor or other entity who will share some responsibility for his court appearances. In the final analysis, the decision as to which defendant will be granted recognizance, as well as the amount of bail, is left to the discretion of the trial judge. See MO.REV.STAT. § 545.010, et seq. (1986).
As the number of those arrested for drug-related offenses soared, the court seems to have established more stringent standards for recognizance releases and required higher bail bonds. Generally, the St. Louis circuit courts appear to have established a practice which denied recognizance or low bail to almost every person charged with the sale of any controlled substance, no matter how small the price or quantity of drugs. Even the possession of residue of a drug makes recognizance bond more unlikely. Bail is, of course, out of the question, for most of those arrested are penniless.
To be especially noted here is that there is always concurrent state and federal jurisdiction for drug-related offenses. When the circumstances of the charge are of any real significance, such as possession of moderate quantities of drugs, weapons, involvement of children, or violence, as a practical matter, the defendant is charged in the federal courts here because the punishment is usually swifter, more certain, and severe.
The Court clearly recognizes that drug trafficking and usage must be curtailed, but holding minor miscreants in jail for six months without treatment, training, or education only postpones the havoc that will be reaped on the community when they are released. Something more is needed.
While it is both natural and predictable to expect the greatest concentration of law enforcement to be centered in those areas where crime appears to be more prevalent, it is also axiomatic that abuses there are likely to be condoned or ignored. These areas are usually in the poor and minority neighborhoods where jobs are scarce, education is substandard, and the promise of the "American dream" has died. Certain neighborhoods in St. Louis have become the target of intensive police activity, including high surveillance and "battering ram" search warrants. Obviously, such intrusive tactics increase that resentment and anger toward law enforcement which always seethes below the surface. These intrusive tactics, coupled with detention because of poverty, lead to a destruction of confidence in the criminal justice system. Prisons and punishment alone cannot be the answer  there must be encouragement, assistance, and above all, confidence in the fairness of the legal system. Mass detention for petty offenses now may give temporary relief but it only postpones the misery to come.

The Problem
There is a consensus based upon a cursory reading of the statutes and case law that the City of St. Louis alone is responsible for building and maintaining a jail to hold persons awaiting trial. Neither the courts nor the prosecutor will admit that they have any responsibility for operation of the jails, even though the City has to receive without discretion all the prisoners *537 delivered to the jail by the defendant Sheriff of the City of St. Louis. Cleary the Mayor has tacitly accepted this obligation and has empowered his staff to search for a solution to this difficult problem.
Most persons charged with drug-related offenses rarely are released on recognizance or low bail; they must wait six months or more for trial; consequently, both the jail and the MSI are filled with pretrial detainees.
The problem, then, is simply this: Because of the great increase of persons arrested for drug-related offenses, there is no room in the jails.
The detainees are not convicts; they are waiting for trial. Therefore, neither the State of Missouri nor the City of St. Louis can impose penal punishment upon any individual not yet proven guilty, in the absence of a specific judicial finding denying the individual defendant bail. See Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979); Campbell v. Cauthron, 623 F.2d 503, 505 (8th Cir.1980). (The State has no right to punish pretrial detainees.)

The Simplistic Solution  "Build More Jails?"
Statistics both here and nationwide show that the scourge of drug-related crimes accounts for the bulk of the increased arrests and imprisonments. Detention for other crimes has remained relatively stable for the past several years.
In 1985 there were about 1,800 drug-related arrests in St. Louis but in 1989 there were more than 5,000. In 1990, over 9,000 arrests are projected. Obviously, the drastic increase in arrests is directly attributable to arrests for drug-related activity.[2]
It is current wisdom to believe that the solution to crimes, especially drug-related offenses, is to simply imprison violators for long terms (or forever). But such massive imprisonment has a serious sociological cost unrecognized by many. It is a "ticking time bomb."
The rationale of law enforcement and, indeed, of some judges, is that inasmuch as these prisoners are drug dealers, addicts, or in possession of drugs, their propensity to commit additional crimes is so great that they must be confined even though they have not yet been convicted. They even hold this opinion when there has been no judicial determination of a particular individual's danger to the community if released on bail or recognizance. The practical effect of this philosophy is to imprison only those persons unable to pay for a professional bond. (Petty drug offenses are bondable.) Consequently, the poverty of the accused is really the prime reason for his incarceration. While the rich get bail, the poor go to jail.
The difficulties of the situation are not confined to the problem of the detainees alone. After all, the police, prosecutors, and judges are expected, indeed some might well argue, mandated to perform their duties with maximum effort. As Gay Carraway, Director of Public Safety for the City of St. Louis, has said:
We cannot ask the Police to stop arresting criminals, we cannot ask Missouri State Probation and Parole to curtail their actions to control their charges, we cannot ask the Circuit Attorney to stop issuing informations and indictments, and we cannot ignore the problems faced by the Sheriff, who has no other place to deliver prisoners after court disposition other than the City's two jails.
There has been a fundamental change in the attitude and philosophy of America today when compared to those ideals prevalent during the years of the "Great Society." The theme of "law and order" is now the predominant opinion of the nation. Those who would argue that the underlying causes of crime are poverty, discrimination, and lack of education are impatiently shunted aside with little empathy or interest. The commonly held belief is that larger prisons, longer sentences, and more executions will end crime. But the figures belie those conclusions. In the last 10 years the United States imprisoned a larger *538 percentage of its population than any other country in the Western world. There are more than 62,000 prisoners in federal penitentiaries, and in excess of 700,000 prisoners in custody in the 50 states. Additionally, there are at least one-half million individuals on probation or parole. Of course, the dollar cost is enormous, but the cost in human suffering is incalculable.
Obviously, any civilized nation must have prisons as a deterrent for certain violent crimes and persistent offenders. But to go blithely along imprisoning more and more young people without attempting to treat, eliminate, or even acknowledge the root causes of their misconduct is short sighted and uneconomical. In the years to come we will pay dearly for our indifference to the signs of danger now about us.
Prison is, at best, a demeaning experience and should be reserved only for those convicted of crimes, not those who are too poor to be released while awaiting trial. Therefore, a policy of imprisoning nearly all drug-related offenders, no matter how insignificant the amount of the drug or its value, may well be counterproductive. Most of the persons now arrested for these drug-related offenses are young black men from North St. Louis. Their prospects are as bleak as their surroundings. They have no family, no roots, no education, no jobs, no future. Drugs are a source of escape, often the only source of desperately needed funds. To incarcerate them may give temporary relief to a street or a neighborhood, but they come back from the "prison finishing school" more shrewd, more adept, and more desperate than before because while awaiting trial they commingle with the post-graduates of crime.
While the racial connotations of this issue are seldom mentioned, they may, nonetheless, be a factor in the public's perception of the drug problem. There are myths, which have been partially developed by the media, that only minorities are involved with drugs. The City's prison population, nearly all black, perpetuates this misconception. The Court does not believe that racial identity is used as a factor in these matters; but nonetheless, because most blacks who are arrested are poor, they are more likely to be detained when denied recognizance.
The trial to determine the guilt or innocence of the defendant may not occur for many months, even years. The average time for a drug-related case to go to trial is nine months. Rarely is there a specific judicial determination that an individual detainee is a risk to society or that he will not appear for trial; the general determination is since he has been arrested for a drug-related offense he will, ipso facto, commit other crimes. Because he is poor he cannot make bail. Because he is without money he must rely on the public defender as his lawyer. Public defenders are few and burdened with excessive caseloads. There will be delays.
Recent public articles indicate that nearly one of every four young black males is in jail or on probation or parole. It is estimated that 609,690 blacks aged 20 through 29 are under the control of the criminal justice system, i.e., are either incarcerated or on probation or parole. This figure represents almost 23 percent of the entire black population for that age group. The report, "Young Black Men and The Criminal Justice System: A Growing National Problem," published by The Sentencing Project, fears that if this trend continues, "we may be writing off an entire generation of black men from leading productive lives." What a legacy!
Of the 228 prisoners in the City Jail and the 450-480 inmates ordinarily imprisoned in the MSI, about 92 percent, are black men. Perhaps that is one reason our society is so indifferent to the plight of those now imprisoned.
There is little doubt that new jail facilities are desperately needed in the City of St. Louis. The City Jail and MSI are more than 60 years old. Bricks, mortar, and cement are crumbling away. Even if these buildings had received regular and sufficient maintenance, the ravages of weather, time, and erosion would have still occurred. They now require extensive repair and replacement. An investment in a new structure *539 would be economically wise and organizationally sensible.
To that end, this Court endorses the goal of replacing the two antiquated structures with a replacement jail better designed to utilize modern heating and lighting, architectural design, and greater security. But, by caveat, this Court is not convinced that building a bigger jail merely to hold an expanding population is appropriate. Rather, processes must be designed to reduce the number of accused persons in jail awaiting trial, not simply by building a bigger jail to hold more prisoners. A new jail would be better, but need not be bigger.
In that light, and as a suggestion to those not now before this Court as litigants, the Court suggests the following alternatives as possible solutions. Drug-related offenses are at the core of the current difficulties; therefore, these suggestions are geared toward that class of offenses.

Possible Alternatives
The following suggestions are possible alternatives to the building of a bigger jail. They all have some disadvantages and many have at times been given experimental usage here; however, none are being exhaustively tested today. Because many of the essential parties are not now before the Court, this Court does not presently have jurisdiction to mandate their usage; the Court hopes that they will be carefully considered as suggestions by all of the relevant officials who will take a less parochial view of their official duties, and analyze the needs of the entire community as well. This Court has attempted to do that. In particular, the State of Missouri needs to look closely at its role in the detention of these persons.[3]

Suggestions
1. (a) There must be a substantial reduction in the time detainees spend awaiting trial. This time might be shortened by fuller utilization of all of the available judicial personnel for criminal cases. Perhaps nearly all of the circuit judges could devote the next 60 days to criminal cases, thus assuring speedier trial to the defendants; giving priority to confined defendants might also be effective.
(b) Substantially increasing the number of public defenders and staff.
(c) Assignment of a larger caseload and more rapid usage of the "bulk criminal division" to encourage speedy dispositions. Many pleas and dispositions could be processed in 60 days or less.
2. Increased usage of the various forms of recognizance bail bonds.
3. The use of electronic shackling and other forms of home arrests should be expanded since risk of third-party losses appears inapplicable to detainees not yet convicted.
4. The elimination of the jail as a detention facility for military arrestees, parole violators, and persons convicted but awaiting other trials.
This Court has held numerous meetings in chambers with the attorneys for the plaintiff class, representatives of the Missouri Attorney-General and the United States Attorney for the Eastern District of Missouri, the administrators and staffs of the various city departments, with representatives of the judges of the Twenty-Second Judicial Circuit, the Public Defender, and the Circuit (Prosecuting) Attorney. In addition, the Court has conferred with the Warden of the MSI and personally viewed and inspected the facility there. In all of these activities, this Court has tried to teach by example the principle of working for the advantage of the whole community rather than following in halter-fashion the inclination of reaching goals for their own individual agency or office. An agreement reached by consensus and stipulation of all *540 the pertinent parties, whether litigants or not, would result in a far more harmonious and efficient resolution than one reached by fiat of the Court.
The criminal justice system is composed of various facets; many of the individuals, agencies, and officials have statutory and precedential duties that at times overlap, duplicate, or contradict one another. Nonetheless, the system must act with coordination and acceptance of the broader community interests. This means that there may well be occasions when officials and agencies, acting cooperatively, must exercise sound discretion and some forbearance in carrying out the responsibilities of their individual offices.
The Mayor has convened a jail population committee which is chaired by Ms. Suzanne Hart, the chairperson of the St. Louis Crime Commission. The members of this committee include representatives of the Mayor's staff, the circuit judges, the sheriff, and the St. Louis circuit attorney. They have met regularly for more than a year and are about ready to present to the community a plan for building a new jail and remodeling the courthouses. This Court applauds their efforts and endorses the building of a new jail, as they recommend, but, as has been noted, not necessarily a much larger one.
The Court also appreciates the vigilance and devotion of Frank Susman, the appointed attorney for the plaintiff class, who has steadfastly kept the interests of his clients before the Court, and the cooperation of the City Counselor's assistants, who have kept the Court informed of conditions on a day-to-day basis. The Court is especially grateful to the new administrative staff of Mayor Schoemehl, including Gay Carraway, Edward L. Tripp, and the two wardens, Dora Schriro and Julian Boyd. The Court has taken the cooperative stance of these officials into consideration in drafting its Orders.
While the Court is acutely aware of the fact that the average citizen fears crime more than he does war, famine, pestilence, or flood, one still wonders if this fear will encourage him to open his billfold for a new jail costing millions of dollars. This difficulty exists in every community, but is especially true in a city which finds it most difficult to increase taxes for anything (except a football stadium), including schools, hospitals, roads, or sewers. The City of St. Louis, with its limited resources, has greater financial responsibility to provide for more indigent citizens than any other county in Missouri.
But even if we assume that there are a sufficient number of public-spirited citizens who do not mind shouldering the financial burden of building a new jail, its construction would take from three to seven years to complete. In that crucial interim, those persons who are confined must continue to be afforded constitutional standards of health and safety while being incarcerated. Therefore, while a new jail is under construction a system must still be developed to house prisoners under conditions meeting constitutional requirements.
In summary, then, while conditions in the St. Louis jails have been considerably improved (due, in large measure, to Court Orders), the problem of overpopulation has grown worse. This has occurred primarily because of the dramatic increase in arrests for drug-related offenses.
The greater number of persons arrested and the subsequent prosecution for the most trivial drug offense has caused even greater delays in a court already congested. The determination by the Missouri judges to reduce or eliminate recognizance releases has, in effect, mandated that the vast majority of those arrested for these minor drug violations must remain in jail until trial, for they have no money, bail, or attorneys; in most cases they even lack funds for food or shelter. Inasmuch as prompt trials rarely occur, they wait many months for trial. When they are finally sentenced, it is frequently for "the time served awaiting trial."
Virtually all of those accused of drug-related offenses in St. Louis are charged only with minor sales or possession of very small quantities of controlled substances. The police have no difficulty in finding these offenders. They scoop them up from *541 the corners of North St. Louis like shovelfuls of sand from a beach; however, they still need assistance and deserve treatment even while they are in jail. These persons are still men and women who are entitled to be treated with dignity as human beings. If after being accused they are to be kept in jail for protracted periods to await trials, they must be accorded the protection that the Constitution guarantees to all of its citizens.
This Court is under the solemn duty to uphold the Constitution. This includes the duty to enforce those laws, unpopular though they may be, to maintain standards of health and safety even for prisoners who may have violated the law. The State must protect its prisoners against attack and abuse; the State must furnish housing and sanitary conditions which take recognition of the dignity of man. Above all, the State cannot itself violate the law even though its prisoners may have done so. See generally Bell, 441 U.S. at 520, 99 S.Ct. at 1864. (Conditions for pretrial detainees are to be judged under the Due Process clause of the Fifth and Fourteenth amendments.)
In this memorandum, the Court has made suggestions that, in its opinion, might well reduce the number of persons held so long for trial. But the named defendants, as well as others not now before this Court as party litigants, may accept in whole or in part those suggestions or utilize other alternatives. They may, if they wish, disregard all of the suggestions and continue to follow their present policies. So, if the State of Missouri and the City of St. Louis, through their agencies and entities, wish to continue to hold in jail huge numbers of persons accused of petty drug offenses, but thereafter fail to provide speedier trials, the citizens of St. Louis must bear the costs of providing a safe and sanitary institution in which to imprison them.
While the suggestions contained in this memorandum may be accepted or rejected by the litigants, the accompanying Orders are designed to maintain the minimal health and safety standards required by the Constitution; they MUST be complied with. The State of Missouri and the City of St. Louis must follow the law as well as enforce it. Otherwise, the jails must be closed.
NOTES
[1] Years ago there were many persons serving short sentences in the MSI for violations of these offenses. Today, because of the scarcity of beds, the Municipal Courts rarely impose a penal sentence, and then only for the most flagrant or repetitive offenders.
[2] Regis Reports, compiled for the Jail Population Monitoring Board.
[3] There are pending motions seeking to join the State of Missouri as a party defendant. The Court has not yet ruled on the motions, but notes that the judges are appointed by the Missouri Governor and that the Public Defender Office is funded by the State. The City of St. Louis has no control over the Police Department, the Prosecutor, or the Public Defender.